**In re CALUMET FARM, INC., Debtor In Possession.**

**CALUMET FARM, INC., Plaintiff,**

v.

**BLACK CHIP STABLES, et al., Defendants.**

Bankruptcy No. 91–51414.
Adv. No. 92–5003.

United States Bankruptcy Court, E.D. Kentucky, Lexington Division.

Dec. 23, 1992.

Philip L. Hanrahan, Lexington, KY, for Calumet Farm, Inc.

Steven L. Beshear, Lexington, KY, for Phoenix Corp.

J. Montjoy Trimble, Lexington, KY, for J.T. Lundy, Due Process Stable, Hill 'N Dale Farm, Black Chip Stables, a Partnership composed and Comprised of Terry Beall and William Allen, Doric, Inc.

Fred E. Fugazzi, Jr., Lexington, KY, for Craig B. Singer dba Singer Farm, Inc.

Taft A. McKinstry, Lexington, KY, Ira S. Greene, New York City, for Axmar Stable, a division of Axmar Invt. Co.

Thomas W. Miller, Lexington, KY, for Daniel M. Litt, Washington, DC, for Riggs National Bank of Washington, DC.

Gregory D. Pavey, Lexington, KY, for First City, Texas–Houston, N.A.

Lynn R. Schrader, Lexington, KY, for Woodrow Marriott.

Patrick Madden, Lexington, KY, for F.E.N. Stables Corp., J.M.J. Stables Corp.

Patrick Madden, Tracey N. Wise, Lexington, KY, for Matchmaker Financial Corp., Equine Capital Corp.

Donald S. Guier, Enforcement Legal Section, Frankfort, KY, for Com. of Kentucky Revenue Cabinet.

Michael R. Engleman, Louisville, KY, for Bank of New York, Citizens Fidelity Bank & Trust Co.

## MEMORANDUM OPINION

JOE LEE, Chief Judge.

By Count II of the First Amended Complaint in this adversary proceeding, the debtor in possession, Calumet Farm, Inc., seeks an order permitting it to sell the estate's interest and the interests of the defendant co-owners, Black Chip Stables, a partnership, and Doric, Inc., in the thoroughbred stallion WILD AGAIN. A trial on the issues raised by Count II of the complaint, which is grounded on section 363(h) of the Bankruptcy Code, 11 U.S.C. § 363(h), was held September 30 and October 1, 1992. At the conclusion of the trial the court ruled from the bench that (1) the debtor, Calumet Farm, Inc., had, at the time of the commencement of its chapter 11 case, an undivided interest as a tenant in common in the stallion WILD AGAIN, (2) partition in kind of the stallion among the estate and the co-owners is impracticable, and (3) sale of the estate's undivided interest in the stallion would realize significantly less for the estate than sale of the stallion free of the interests of the defendant co-owners. The parties stipulated the obvious, that paragraph (4) of 11 U.S.C. § 363(h) is inapplicable. The court reserved ruling on the issue of whether the benefit to the estate of the sale of the stallion free of the interests of the defendant co-owners outweighs the detriment, if any, to the defendant co-owners. The parties have submitted briefs on that issue for consideration of the court.

## FINDINGS OF FACT:

WILD AGAIN was one of 12 yearlings purchased as a group in 1981 by Black Chip Stables for approximately $450,000. The purchase price of WILD AGAIN was $35,000. (Tr. 10–1–92, pg. 126). As a two-year-old WILD AGAIN had moderate success on the race track. He developed "bone chips" and did not race as a three-year-old. As a four-year-old WILD AGAIN was remarkably successful, setting a track record while winning the Meadowlands Gold Cup. Black Chip Stables decided to enter him in the first Breeder's Cup Classic in 1984. Because of the hiatus in his racing career as a three-year-old and nonpayment of the Breeder's Cup fee for that year, Black Chip Stables was required to pay a $360,000 supplemental entry fee. WILD AGAIN won the first Breeder's Cup Classic, the richest race in the world at the time, beating SLEW O GOLD and GATE DANCER by a nose at the wire. (Tr. 10–1–92, pgs. 127–131).

On April 18, 1985, Black Chip Stables and the debtor, Calumet Farm, Inc., entered into a WILD AGAIN Syndicate Agreement pursuant to which the ownership of the stallion was divided into 40 shares, each representing an undivided 1/40 interest in the stallion. The partners in Black Chip Stables retained 20 of the shares and agreed to sell the other 20 shares to Calumet Farm, Inc. for $6,000,000, payable in part in cash, in part with breeding seasons to Calumet stallions plus a share in one stallion, and in part by notes payable to individual partners of Black Chip Stables. Plaintiff's Exhibit No. 1.

Under the agreement WILD AGAIN was to continue racing until retired to stud on or before December 1, 1985. WILD AGAIN suffered injuries during the 1985 racing season and was retired from racing somewhat earlier than anticipated. (Tr. 9–30–92, pg. 111; Tr. 10–1–92, pgs. 34–35).

The agreement provides that the owners of shares are co-owners of undivided interests in the stallion and further that each co-owner is entitled to one free nomination (the right to breed one mare to the stallion during a breeding season) for each share owned. Thus the seller, Black Chip, and the buyer, Calumet Farm, Inc., are each entitled to breed 20 mares to the stallion during each breeding season. Plaintiff's Exhibit No. 1.

In addition, the agreement provides that the trainer is to receive two nominations to the stallion during the life of the stallion without cost and that the syndicate manager is to receive as compensation for his services four free nominations in each breeding season. Consequently, the normal book of the stallion in each year was expected to be 46 mares plus such additional nominations as might be determined by the syndicate manager in his sole discre-

tion. See Fourth paragraph of Plaintiff's Exhibit No. 1.

J.T. Lundy, then president of the buyer, Calumet Farm, Inc., was designated as syndicate manager. The court has previously determined that his status as syndicate manager was not contingent on his remaining in office as president of Calumet Farm, Inc., a position from which he resigned prior to bankruptcy.

The agreement provides that from and after the effective date of the agreement (December 1, 1985), WILD AGAIN shall stand at stud at Shadowlawn Farm, Midway, Kentucky, or if not there, at another place in central Kentucky designated by the syndicate manager, under the care, promotion and general management of the syndicate manager, including without limitation the supervision of all breeding activities. It was agreed that Shadowlawn Farm or other designated farm would be paid quarterly by the co-owners (in proportion to the number of shares owned by them) the prevailing rate for stallion keep in the area.

The stallion stood at stud at Shadowlawn Farm during the 1986, 1987 and 1988 breeding seasons and was by agreement of the parties moved to Calumet Farm prior to the 1989 breeding season.

The controversial provision of the WILD AGAIN Syndicate Agreement that prompted the filing of the complaint by the debtor in possession to sell not only the estate's interest in the stallion but the interests of the co-owners as well, is a provision that restricts the right of the co-owners to change syndicate managers and to determine where the stallion will stand at stud.

The agreement provides that the provisions of the agreement "with reference to the location of the Stallion at stud and the services of the Syndicate Manager shall remain in effect unless and until the Co-owners, by a vote of three-fourths (¾) of the shares, shall determine otherwise...." The farm views this provision as having a chilling effect on the marketability of Calumet's shares in the stallion because the purchaser of the shares would take them subject to the terms of the WILD AGAIN

Syndicate Agreement and would not be able, without the consent of the other co-owners, to change the syndicate manager or determine where the stallion will stand at stud. According to witnesses for Calumet, selling the stallion as a whole free of the restrictions of the WILD AGAIN syndicate agreement would increase the expected sales price. They believe that control of the stallion, that is, the ability to determine where the stallion will stand at stud and the right to receive four free annual breeding rights for management of the stallion, adds considerably to the value of the stallion. The right of the farm where the stallion stands to receive four free annual breeding rights for management of the stallion is estimated to be worth $350,000 to $560,000 during the remainder of the life of the stallion. (Tr. 9–30–92, pg. 121; Tr. 10–1–92, pgs. 167–168).

There has been a de facto change in the management of the stallion. In a separate adversary proceeding the court ruled that J.T. Lundy, the syndicate manager, could, pursuant to the terms of the syndicate agreement, move the stallion from Calumet Farm to Three Chimneys Farm for the 1992 breeding season. Robert Clay, owner of Three Chimneys Farm, has served as de facto stallion manager, assuming responsibility for booking mares to the stallion in the absence of Mr. Lundy. (Tr. 9–30–92, pgs. 74–75; Tr. 10–1–92, pgs. 140, 154–160, 173). Nevertheless, the co-owners have been unable to agree on a replacement for Mr. Lundy. (Tr. 9–30–92, pgs. 32–37; Tr. 10–1–92, pgs. 161–163). Relocation of the stallion was necessary because the Calumet Farm case is a liquidating chapter 11 case and the farm was scheduled for sale at auction during the 1992 breeding season.

In July of 1988, at approximately the time WILD AGAIN began standing at stud at Calumet Farm, Calumet Farm, Inc. granted a security interest to First City National Bank of Houston (now New First City Texas–Houston, N.A.) in substantially all of its stallions, broodmares, foals and stallion shares, including the 20 shares of the debtor in WILD AGAIN, to secure indebtedness evidenced by a series of notes

executed by the debtor to the bank. The debtor owes First City approximately $33,-500,000. This includes approximately $1,500,000 in postpetition financing provided to the debtor in possession by the bank.

First City supports the complaint of the debtor in possession to sell the interests of the co-owners as well as the interest of the estate in WILD AGAIN. In fact, with the concurrence of counsel for the debtor in possession, counsel for First City presented evidence in support of the complaint. The bank's theory is that sale of the stallion free and clear of all ownership interests will produce a substantially greater amount for the estate of the debtor, and in turn a substantially greater amount for application to the indebtedness to First City.

According to *The Blood-Horse* magazine, WILD AGAIN is ranked in the top 65 of approximately 5,000 stallions standing at stud in North America. In 1989, as a first crop sire, WILD AGAIN was ranked 35th among the 65 leading sires; in 1990 as a second crop sire he moved up to 26th in rank, and in 1991 as a third crop sire he was ranked 14th. Based on earnings of his offspring through September 13, 1992, he is presently ranked 12th among the 65 leading sires. (Defendants' Exhibits Nos. 1, 2, 3 and 4) (Tr. 9–30–92, pgs. 46–55).

An appraisal by the American International Bloodstock Agency, Inc. dated April 15, 1991, prior to the commencement of Calumet's chapter 11 bankruptcy case, fixed the value of Calumet's 20 shares in WILD AGAIN at $2.5 million to $3 million. (Plaintiff's/First City Exhibit No. 3). Due to the performance of WILD AGAIN's offspring during the 1991 and 1992 racing seasons, the value of these shares may have increased somewhat since bankruptcy intervened. (Tr. 9–30–92, pg. 30).

John T. Ward, successor to J.T. Lundy as president of Calumet Farm, Inc. and presently the chief operating officer of the debtor in possession, fixed the value of Calumet's interest in the 20 shares in WILD AGAIN at $1.5 million to $1.75 million, if someone purchased the shares for investment purposes for the income that could be derived from selling annual seasons to the stallion. Such an investor would have very little say in the management of the stallion. However, Mr. Ward estimated the stallion to be worth $6 million to $7 million, even in this bad market, if sold as a whole (Tr. 9–30–92, pgs. 36–39, 63–66), whereby the purchaser might gain control of the horse. (Tr. 9–30–92, pgs. 76–80).

Price Headley Bell, president of Nicoma Bloodstock Agency, a fourth generation horseman whose clientele includes leading breeders in England, France and the Middle East, fixed a low value for the stallion of $4,200,000 and a high value of $8,400,-000, based on an analysis of the performance of WILD AGAIN on the race track and as a sire of stakes winners. (Tr. 9–30–92, pgs. 107–118).

In Mr. Bell's opinion a sale pursuant to which only the debtor's 20 shares in the stallion are sold, so that the defendants retain their one-half interest in the stallion and Mr. Lundy stays on as syndicate manager, would eliminate most of the local horse farms as potential bidders because those farms would be interested in purchasing the stallion in order to become syndicate manager. He fixed the value of Calumet's 20 shares sold individually or as a group for investment purposes at $75,000 per share or a total of $1.5 million (Tr. 9–30–92, pg. 119), approximately the same value placed on the shares for investment purposes by Mr. Ward.

Mr. Bell's view was that the best way to realize the most money and what the horse is really worth would be to permit the defendants to retain their one-half interest in the horse and to sell Calumet's one-half interest in the horse along with the right to appoint the syndicate manager. If Calumet's interest in the stallion could be sold in that manner, he estimated the value of each share at $150,000 or a total value for the stallion of $5.6 million, which would realize $2.8 million for Calumet's interest in the horse. He estimated the value to a purchaser of being able to serve as syndicate manager for the life of the stallion at

$420,000 to $560,000. (Tr. 9–30–92, pgs. 119–121).

The litigants in this matter realize, of course, that the sale of Calumet's shares would be subject to the terms of the WILD AGAIN Syndicate Agreement and would not include the right to choose the syndicate manager, which is why the debtor in possession wishes to sell and the defendants oppose the sale of the entire horse. Mr. Bell estimated that while it may be more difficult for a purchaser to come up with the money to purchase the entire horse, it was his view that the entire interest in the horse can be sold for between $5.6 million and $7 million (Tr. 9–30–92, pgs. 122–125), more probably $5.6 million. (Tr. 9–30–92, pg. 144).

Two witnesses for the defendant co-owners took issue with the thesis of John Ward and Price Headley Bell that sale of the estate's interest and the co-owners' interests in the stallion, in other words sale of the whole horse, will produce significantly more for the estate than merely selling Calumet's 20 shares in the horse.

These witnesses, Phil T. Owens of American International Bloodstock Agency, Inc. and Nancy W. Yearsley of Yearsley Bloodstock Services, Limited, both experienced bloodstock agents, were of the view that more of their clients would be interested in purchasing individual shares in the stallion than would be interested in purchasing the entire horse. For this reason they believed that selling Calumet's 20 shares in the stallion would produce more for the estate than would the sale of the entire horse. It was their shared opinion relatively few purchasers would have the financial wherewithal and be willing to assume the financial risk involved in purchasing the entire horse.

According to Owens, if the horse were sold as a whole, the 40 shares belonging to Calumet and the co-owners would be worth $80,000 to $90,000 per share, making the whole horse worth $3.2 million to $3.6 million; whereas, Calumet's 20 shares in the stallion could be marketed for $100,000 to $120,000 per share thereby producing $2 million to $2.4 million for the estate as compared to $1.6 million to $1.8 million that might be realized from the sale of the whole horse.

Ms. Yearsley was of the opinion that the whole horse would sell for approximately $4 million, a realization of $2 million for Calumet's interest in the horse; whereas, Calumet's individual shares in the stallion could be sold for approximately $125,000 per share which would produce $2.5 million for the estate.

The foregoing estimates of realization for the estate from the sale of Calumet's shares in WILD AGAIN may not take into account commissions payable to bloodstock agents for sale of the shares or the time lag in selling shares, although both witnesses believed the shares would be readily salable.

The witnesses for the defendant co-owners did not think that the value of Calumet's shares in the stallion when sold separately would be affected much by the retention by the co-owners of their interests in the stallion, the identity of the syndicate manager, or where the stallion was standing at stud, so long as it was standing at a reputable thoroughbred horse farm.

Ultimately, the court was more persuaded by the testimony of Mr. Ward and Mr. Bell that selling only the estate's interest in the horse, in other words selling only Calumet's shares, would net significantly less for the estate than would the sale of the entire horse. Accordingly, the court ruled from the bench that the plaintiff debtor in possession had met the burden of proving that sale of only the estate's interest in the stallion would realize significantly less for the estate than sale of the stallion free of the interests of the defendant co-owners.

Thus the factual issue on which this matter hinges is whether the benefit to the estate of the sale of the stallion free of the interests of co-owners outweighs the detriment to the defendant co-owners.

As previously recited, the evidence of the plaintiff suggests that the sale of Calumet's 20 shares in the stallion will produce an estimated $1.5 million for the estate. On the other hand, if offered for sale free

of the interests of the co-owners, the stallion may be sold for as much as $7 million, or more realistically perhaps $5.6 million, resulting in a distribution of $2.8 million to the estate and $2.8 million to the co-owners. These figures suggest that sale of the stallion free of the interests of the co-owners would produce $1.3 million more for the estate than would the sale of Calumet's one-half interest (20 shares) in the horse. (Tr. 9–30–92, pgs. 119–122).

The defendant co-owners contend that the amount of potential benefit to the estate from the coerced sale of their interests in WILD AGAIN is greatly exaggerated by the above estimate. They also contend that in any event the detriment to them resulting from the sale of their interests in the stallion outweighs any benefit to the estate.

According to the evidence of the defendants, such a sale will deprive them of a stream of income that may net them an estimated $4,808,675, or an average of $600,000 per year, during the remaining eight-year useful life of the stallion. They suggest that by retaining rather than selling its 20 shares in the stallion the estate may enjoy similar earnings and would receive in approximately four years an amount equivalent to the amount it will receive from the sale of all interests in the stallion. The defendants also point out that they will not be able to reinvest their share of the proceeds of sale in a manner that would yield a return comparable to the present return on their investment and will therefore suffer a considerable detriment from the sale. They assert they know of no investment opportunities that will yield a return comparable to the present return on their investment in WILD AGAIN. The defendants also insist the court should consider as an additional detriment the fact that they will incur substantial federal and state tax liabilities aggregating to a combined rate of 28% on their share of the proceeds of sale. These assertions are based on the testimony of a CPA and a tax attorney.

Calvin Cranfill, a CPA, presented a computation of the discounted present value of the net income for WILD AGAIN share owners for the period between 1993 and the year 2000, based on three assumptions: (1) that the remaining breeding life of the stallion is eight years; (2) that the stud fee will remain at $35,000 during that period; and (3) that the stallion will continue to breed 90 mares annually during 1993, 1994, and 1995, and 65 mares annually between 1996 and the year 2000. The computation takes into account the six free breedings assigned to the trainer (2) and the syndicate manager (4) from which no income is received by the syndicate for the shareholders. Charts prepared by Mr. Cranfill on which his testimony is based are as follows:

### PROJECTED INCOME FROM WILD AGAIN
### ASSUMPTIONS USED
### FOR THE EIGHT–YEAR PERIOD FROM 1993–2000

Season Fee $35,000
Remaining Breeding Life 8 years
Annual Breedings

| Year | Total | Free | Paid/ Used |
|------|-------|------|------------|
| 1993 | 90 | 6 | 84 |
| 1994 | 90 | 6 | 84 |
| 1995 | 90 | 6 | 84 |
| 1996 | 65 | 6 | 59 |
| 1997 | 65 | 6 | 59 |
| 1998 | 65 | 6 | 59 |
| 1999 | 65 | 6 | 59 |
| 2000 | 65 | 6 | 59 |

| | YRS/1–3 | YRS/4–8 |
|-------------------------------------------|-----------|-----------|
| **Annual Expenses** | | |
| Advertising | $ 5,000 | $ 5,000 |
| Breeder's Cup Fee | 35,000 | 35,000 |
| Board | 12,000 | 14,000 |
| Mortality Insurance ($5,000,000 @ 2.7%) | 135,000 | 135,000 |
| Barrenness/Prospective Foal Insurance | 441,000 | 392,350 |
| Total Annual Expenses | $628,000 | $581,350 |

| Effective Tax Rate | Federal | 28% |
|--------------------|----------|-----|
| | State | 5 |
| | Combined | 33% |

### PROJECTED NET INCOME FROM BREEDING WILD AGAIN
### 1993 THROUGH 2000

| | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | TOTALS |
|----------------------------------------------|-------------|-------------|-------------|-------------|-------------|-------------|-------------|-------------|--------------|
| **Stud Fee Revenue** ($35,000 × 84) | $2,940,000 | $2,940,000 | $2,940,000 | | | | | | $19,145,000 |
| ($35,000 × 59) | | | | $2,065,000 | $2,065,000 | $2,065,000 | $2,065,000 | $2,065,000 | |
| **Annual Expenses** | (628,000) | (628,000) | (628,000) | (581,350) | (581,350) | (581,350) | (581,350) | (581,350) | (4,790,750) |
| **Income Before Tax** | 2,312,000 | 2,312,000 | 2,312,000 | 1,483,650 | 1,483,650 | 1,483,650 | 1,483,650 | 1,483,650 | 14,354,250 |
| **Tax Expense @ 33%** | (762,960) | (762,960) | (762,960) | (489,605) | (489,605) | (489,605) | (489,605) | (489,605) | (4,736,905) |
| **Net Income–100%** | $1,549,040 | $1,549,040 | $1,549,040 | $ 994,045 | $ 994,045 | $ 994,045 | $ 994,045 | $ 994,045 | $ 9,617,345 |
| **Net Income–50%** | $ 774,520 | $ 774,520 | $ 774,520 | $ 497,023 | $ 497,023 | $ 497,023 | $ 497,023 | $ 497,023 | $ 4,808,675 |

## DISCOUNTED PRESENT VALUE OF NET INCOME
## FOR CASH FLOWS GENERATED BETWEEN 1993–2000
## NET INCOME

| YEAR | NET INCOME | (5%)PV FACTOR | PV |
|------|-----------|----------------|-----|
| 1993 | $774,520 | .952381 | $ 737,638 |
| 1994 | 774,520 | .907029 | 702,512 |
| 1995 | 774,520 | .863838 | 669,060 |
| 1996 | 497,023 | .822702 | 408,902 |
| 1997 | 497,023 | .783526 | 389,430 |
| 1998 | 497,023 | .746215 | 370,886 |
| 1999 | 497,023 | .710681 | 353,224 |
| 2000 | 497,023 | .676839 | 336,405 |

Discounted Present Value of
Net Income—50% Ownership $3,968,057

| YEAR | NET INCOME | (7%)PV FACTOR | PV |
|------|-----------|----------------|-----|
| 1993 | $774,520 | .934579 | $ 723,850 |
| 1994 | 774,520 | .873439 | 676,496 |
| 1995 | 774,520 | .816298 | 632,239 |
| 1996 | 497,023 | .762895 | 379,176 |
| 1997 | 497,023 | .712986 | 354,370 |
| 1998 | 497,023 | .666342 | 331,187 |
| 1999 | 497,023 | .622750 | 309,521 |
| 2000 | 497,023 | .582009 | 289,272 |

Discounted Present Value of
Net Income—50% Ownership $3,696,111

---

Under this analysis, sale of the stallion for less than $7.5 to $8 million would result in some detriment to the co-owners. Only from a sale for that amount would they be able to realize the present value of their projected future income from retention of their interests in the stallion. But as indicated hereinafter, if the Bankruptcy Code protected the co-owners entirely from detriment, there would be no occasion for application of the benefit v. detriment provisions of section 363(h)(3) of the Code. 11 U.S.C. § 363(h)(3).

The plaintiff debtor in possession takes issue with some of the assumptions on which Mr. Cranfill's analysis is based. Mr. Bell testified the useful life of a stallion is regarded to be only 18 years (Tr. 9–30–92, pg. 117), although the plaintiff's other witness, Mr. Ward, acknowledged that it is not uncommon for a stallion to breed until he is 20 years of age. (Tr. 9–30–92, pg. 66).

The plaintiff also contends, based on the testimony of Nancy W. Yearsley, a witness for the defendant co-owners, that in 1994 when the horse becomes 14 years of age, the annual premium for mortality insurance on the stallion will increase from 2.7% to 10 to 12% of the amount insured. (Tr. 10–1–92, pg. 97). The plaintiff's position is that the cost of mortality insurance will be $500,000 or more commencing in 1994 and not $135,000 as shown in Mr. Cranfill's charts. Therefore, with this added expense, the income from breeding the horse would be significantly less than shown in Mr. Cranfill's charts. Obviously, such a dramatic increase in the mortality insurance premium would substantially reduce the amount of future before-tax income for breeding the stallion. Mr. Cranfill testified he kept the cost of insurance constant in his charts at $135,000 per annum on the assumption the amount for which the stal-

lion is insured would be decreased as the stallion ages. (Tr. 10–1–92, pgs. 113–114). It does seem unlikely that mortality insurance on the stallion would be reduced from $5,000,000 to $1,350,000 or less in 1994, the reduction that would be required in order for the premium to remain constant at $135,000 per annum and in order for Mr. Cranfill's income projections to be fulfilled.

Nevertheless, when income projections for the years 1994 through 2000 are adjusted downward to take into account the increased cost of mortality insurance premiums, the income the co-owners may expect to derive from breeding the stallion is in excess of the amount they might expect to receive from reinvestment of the proceeds of sale. For example, if the total net annual income from breeding the stallion is decreased by $250,000 for the years 1994 through 2000, with a resultant decrease of $125,000 in the annual income of the defendant co-owners for those years, that amount of income is more than they can realistically expect to receive from reinvestment of the proceeds of sale.

Gary Matthews, an attorney who advises Black Chip Stables and its principal partner William Allen on tax matters, testified that WILD AGAIN has been fully depreciated on the partnership tax returns, that Black Chip Stables has a zero basis in the horse for tax purposes. Any gain on the sale of the stallion would be passed through the partnership to the individual partners, William M. Allen and Terry Beall, and to the corporate partner, Doric, Inc., a Florida corporation, which purchased an interest in WILD AGAIN from a former individual Black Chip partner, Ron Volkman. Mr. Volkman, an original partner in Black Chip Stables, acquired 5 shares in the stallion under the terms of the WILD AGAIN syndicate agreement. In approximately 1988 he sold his 5 shares to Doric, Inc. for $600,000. William M. Allen is the principal shareholder of Doric. Doric has not yet fully depreciated its interest in the horse. Although William Allen is a resident of Florida, as is Doric, Inc., and Terry Beall is a resident of California, if the stallion is sold in Kentucky they may be required to pay Kentucky income tax on any gain from

the sale. Mr. Beall may be required to pay some additional income tax to California if that state's income tax rate is higher than the Kentucky rate. Apparently Florida residents do not pay income taxes. In any event, Mr. Cranfill took the Kentucky and federal income tax implications into consideration when preparing his charts. The tax implications portrayed in the charts are based in part on the testimony of Mr. Matthews.

According to Mr. Matthews, Mr. Allen has an effective tax rate of 31% which means any capital gain passed through to him from the sale of his interest in WILD AGAIN would be taxed at 28%. Mr. Beall also has a 31% tax rate and would be taxed at 28% on any gain from the sale, and he may have to pay an income tax on the sale to the state of California. Mr. Matthews estimated Mr. Beall's taxes at 38% of any gain from the sale of his interest in the stallion. The federal and state tax rates for the corporate partner Doric, Inc. are graduated, and Doric has not fully depreciated its basis in the horse. Mr. Matthews testified that the tax rates for Doric would range from 18% to 38%. Matthews estimated that if WILD AGAIN were sold for $6 million and the co-owners received $3 million as their share, their aggregate tax liability would be $838,000, which would be an effective rate of approximately 27.9%. The court adopts this percentage as a basis for determining the tax impact of a sale on the co-debtors.

The testimony of William Allen revealed that the Black Chip Stables partnership owns several horses that are racing and that either Mr. Allen individually or Black Chip owns five mares. (Tr. 10–1–92, pgs. 169–171). It is not clear from the record to what extent the defendants or the individual partners may be able to utilize losses, if any, from investments in thoroughbreds to offset the tax consequences or any gain they may realize from the forced sale of their interests in WILD AGAIN.

Mr. Matthews acknowledged that the defendant co-owners possibly could avoid tax consequences of the sale of the stallion by exercising their rights under 11 U.S.C.

§ 363(i) to purchase the stallion at the price at which such sale is to be consummated. (Tr. 9–30–92, pgs. 160–162). In such circumstance the co-owners might have to pay to the estate only the estate's share of the purchase price in order to acquire the estate's one-half interest in the stallion. The co-owners would then have a new basis in the horse for purposes of depreciation.

The plaintiff takes the position that the gain the co-owners would realize from the sale is a benefit rather than a detriment, and that payment of taxes up front on such a gain is not a detriment because the co-owners would pay an equivalent amount of tax on income realized over the next several years if they retain their interest in the stallion.

CONCLUSIONS OF LAW:

■ At the commencement of this chapter 11 case the defendant co-owners and the debtor owned undivided interests in the stallion WILD AGAIN as tenants in common. The WILD AGAIN Syndicate Agreement provides for the division of the "ownership" of the stallion into 40 equal fractional interests and further provides that each such fractional interest ("share") represents an undivided interest in the stallion. Under applicable state law the share owners own undivided interests in the stallion as tenants in common. See *Calumet Farm v. Revenue Cabinet*, 793 S.W.2d 830 (1990).

Partition "in kind" of the stallion among the estate and the co-owners is impracticable. The court rejects the argument of counsel for the defendant co-owners that the fact the "ownership" of the stallion has been divided into fractional interests denominated as shares establishes conclusively that partition of the stallion is practicable. The remedy of partition is applicable only if the "ownership" interests in the property have been divided and a co-owner desires to divide the property itself, thereby terminating the joint tenancy of the parties in the property. The fact that "ownership" interests in property have been divided is not evidence that the property itself is capable of partition "in kind." As the court noted at trial most single family residences are owned by a husband and wife as joint tenants, but the fact that title to property is held in that manner is hardly evidence that a particular house and lot is capable of partition "in kind." Partition "in kind" cannot be accomplished in this case without butchering the horse.

There is conflicting evidence on the question of whether concurrent sale of the estate's interest and the interests of the defendant co-owners in the stallion will benefit the estate more than merely a sale of Calumet's shares representing a one-half interest in the stallion. However, the court was and is convinced that sale of the stallion free of the interests of the co-owners will benefit the estate substantially.

Despite the substantial benefit to the estate to be realized from a sale of the stallion free of the interests of the defendant co-owners the Code permits such a sale only if the benefit to the estate outweighs the detriment to the co-owners.

Based on the facts of this case it is possible to calculate a minimum sales price at which the benefit to the estate outweighs the detriment to the co-owners.

| Sales Price: $6,358,206 | |
|---|---|
| Calumet's (estate's) share | $3,179,103.00 |
| Less amount that would be received from sale of shares | 1,500,000.00 |
| Benefit to estate | $1,679,103.00 |
| Loss of income to defendant co-owners | $3,968,057.00 |
| Less co-owners' share of proceeds of sale after taxes | |
| 3,179,103.00 | |
| × .72 | |
| $2,288,954.10 | $2,288,954.10 |
| Detriment to co-owners | $1,679,102.90 |

A sale at the price of $6,358,206 meets the requirement that the benefit to the estate must outweigh the detriment to the co-owners. Once it is established that the benefit to the estate of a sale is significant and further that the benefit to the estate "outweighs" the detriment to the co-owners, there is no further requirement that the benefit to the estate must exceed the detriment to the co-owners significantly as well. Congress could have mandated that the benefit to the estate must exceed the detriment to co-owners by a significant amount but chose instead to require only that the benefit to the estate must "outweigh" the detriment in order to tip the scales in favor of a sale. Under the language of the Code a sale that results in a considerable or substantial detriment to co-owners is permissible so long as the benefit to the estate outweighs that detriment.

The WILD AGAIN Syndicate Agreement was made subject to the power of Congress to legislate on the subject of bankruptcies. The bankruptcy statutes are part of the agreement as if fully set out therein. Thus the coerced sale of the interests of the co-owners is not a taking of property without due process of law. *Wright v. Union Central Life Ins. Co.*, 304 U.S. 502, 58 S.Ct. 1025, 82 L.Ed. 1490 (1938). It is a result the co-owners agreed to when they entered into the syndicate agreement.

Counsel for the debtor in possession argues that the co-owners will not suffer any detriment from the coerced sale of their interests in the stallion because they will receive their share of the sale proceeds and in addition are given a right of first refusal to purchase the stallion at the price at which a sale is to be consummated. 11 U.S.C. § 363(i) and (j). However, as pointed out by the Second Circuit, if these provisions are viewed as protecting co-owners entirely from detriment the provisions of § 363(h) requiring a balancing of benefit and detriment would be meaningless. *In re Persky*, 893 F.2d 15 (2d Cir.1989).

In the *Persky* case the court recognized that in evaluating detriment to co-owners the court may consider non-economic factors. The only non-economic factor the court is asked to consider in this case is Mr. Allen's professed affection for the stallion. This factor is not at all persuasive. Mr. Allen resides in Florida. Mr. Beall resides in California. The other co-owner, Doric, Inc., is a Florida corporation. The stallion has been standing at stud in Kentucky since 1986 under the management of a syndicate manager who has caused the stallion to be overbred consistently. The income projections of the defendants are based on a pattern of continued overbreeding. The court is persuaded that the defendant co-owners are more interested in the stallion as a money maker than as a companion.

The debtor in possession may sell the stallion at a price that equals or exceeds $6,358,206.