In re Wayne A. STURMAN, Bruce D. Sturman, Howard P. Sturman, Debtors.

Marc Stuart GOLDBERG, Trustee in Bankruptcy of the Estates of Wayne A. Sturman, Bruce D. Sturman and Howard P. Sturman, Plaintiff,

v.

SOUTH EAST PARTNERS CORP., Joseph Warren and Howard P. Sturman, as Co-Executors of the Last Will and Testament of Muriel Sturman, Deceased and Donna Sturman, Defendants.

Bankruptcy Nos. 89–B–11932 (PCB) to 89–B–11934 (PCB).
Adversary Nos. 95–1010A to 95–1012A.

United States Bankruptcy Court,
S.D. New York.

June 24, 1998.

Harrington, Ocko & Monk, L.L.P. by Leonard I. Spielberg, Marc Stuart Goldberg, White Plains, NY, for Marc Stuart Goldberg, Chapter 7 Trustee.

Fisher, Fisher & Berger by Laurence Kaiser, New York City, for Donna Sturman.

Mayer Brown & Platt by Ramiero D'Aversa, Jr., New York City, for Joseph Warren, as Co-executor for the Estate of Muriel Sturman.

Donovan Leisure Newton & Irvine by A. Peter Lubitz, New York City, for South East Partners Corp.

Moses & Singer by Mark N. Parry, Carol Gerber, New York City, for Chase Bank (Formerly Chemical Bank).

Baer Marks & Upham by Bruce Zabarauskas, New York City, for Charles M. Yassky.

Stempel Bennett Claman & Hochberg, P.C. by Richard C. Stempel, New York City, for M.A.S. Limited Liability Co.

Office of United States Trustee by Diana Adams, New York City.

## MEMORANDUM DECISION GRANTING PARTIAL SUMMARY JUDGMENT

PRUDENCE CARTER BEATTY, Bankruptcy Judge.*

This case only proves that neither death nor bankruptcy can sever the binds of family. The issues in this proceeding stem from a partnership created in 1978 by a mother, after the death of her husband, and her four children to continue the ownership and operation of a real estate assemblage located on a desirable corner of the Upper East Side of Manhattan. In the ensuing twenty years, the mother has died, her three sons have been put into bankruptcy involuntarily and are now awaiting sentencing for defrauding five banks out of $38,000,000, and her daughter has been left with little of her inheritance as a result of the actions of her brothers and, to a lesser extent, by her own doing. To add to the saga, the Chapter 7 trustee for the estates of the three brothers has been represented by three different law firms over the years. The bank holding the first mortgage on the assemblage was placed into receivership and liquidated by the Federal Deposit Insurance Corporation. Finally, the attorney representing the remaining executor of the estate of the mother was disbarred last year after pleading guilty to charges of grand larceny. Fortunately those charges were unrelated to this case.

In these consolidated adversary proceedings, the trustee seeks authority under Bankruptcy Code ("Code") § 363(h) to sell the interests of the three estates as well as those of the two co-owners, the sister and the mother's estate, in the assemblage. The trustee has already entered into a contract of sale, subject to court approval, of the entire assemblage for $15 million. The executor of the mother's estate does not oppose the sale. However, the debtors' sister does oppose the trustee's request to sell under Code § 363(h).

The trustee has moved for summary judgment in his favor on his right to sell the entire assemblage under Code § 363(h). The sister has cross-moved for a declaration that the trustee cannot.

This court finds no material facts in dispute on either the motion or the cross-motion. Therefore this matter can be resolved by way of summary judgment, the dispute being one of law.

Based on the findings of fact and conclusions of law which follow, this court holds that under the unique circumstances present in this case the trustee may sell the entire assemblage, including the interests of the non-debtor co-owners, pursuant to Code § 363(h).

### Statement of Facts [1]

*Commencement of the Cases and the Parties Involved*

1. These bankruptcy cases were commenced with the filing of involuntary Chapter 7 petitions in this court against three brothers, Wayne A. Sturman, Bruce D. Sturman and Howard P. Sturman ("Howard" and collectively, the "Debtors") on August 4, 1989 (the "Filing Date").

2. On April 8, 1991, orders for relief were entered against each of the Debtors.

3. Shortly thereafter Marc Stuart Goldberg, an attorney by profession, was appointed interim trustee of each of the Debtors' bankruptcy estates and subsequently be-

---

* Formerly known as Prudence Beatty Abram.

1. The findings of fact are drawn from the documents submitted in connection with the motion and cross-motion as well as from documents filed in the case.

came the permanent Chapter 7 Trustee (the "Trustee").

4. Donna Sturman ("Donna") is the sister of the Debtors. She is not a debtor in any case under the Code.

5. Muriel Sturman ("Muriel") was the mother of the Debtors and of Donna. She died on April 26, 1980, over a decade before the orders for relief were entered. The present executor of her estate (the "Muriel Sturman Estate") is Joseph Warren (the "Executor"). Howard, the oldest of Muriel's four children, had been a co-executor but he has since been disqualified. The Muriel Sturman Estate has not yet been fully administered and the case remains pending in the Manhattan Surrogate's Court.

*The Debtors' Estates*

6. At the time of the Trustee's appointment, the Debtors had interests in a network of corporations and partnerships involved in the ownership and management of real property.[2] Donna held interests in a number of these corporations and partnerships.

7. Shortly after his appointment, the Trustee sought an order from this court authorizing him to manage and operate the various partnerships and corporations in which the Debtors' had interests. On April 30, 1991, the court signed an order which authorized the Trustee, pursuant to Code §§ 721 and 105, to operate and manage for a limited time all of the businesses and proper-

ties owned by the Debtors individually, as partners, co-venturers or shareholders. The order was signed on notice to all relevant parties, including both the Muriel Sturman Estate and Donna. Donna, through her then counsel, interposed no objection to the Trustee's operation of the businesses and properties. However, Donna did object to any implication that the order sought by the Trustee would be considered a determination of her ownership interests, if any, in these businesses and properties.[3] The order granting the Trustee the right to operate the various properties was therefore entered without prejudice as to the determination of the ownership of the properties.[4]

8. The Debtors interests in the assemblage which the Trustee seeks to sell has proved to be the principal asset of the Debtors' estates and it is the only property that the Trustee continues to operate. All of the remaining properties have been disposed of in one fashion or another.

9. The assemblage consists of five contiguous low-rise apartment buildings (the "Assemblage"). The buildings are located on the southeast corner of Third Avenue and 86th Street in Manhattan and are more precisely identified as 1517, 1519, 1521, 1523 and 1525 Third Avenue.

10. The building located at 1525 Third Avenue is situated directly at the corner of Third Avenue and 86th Street.[5] It is the

---

2. In the several years prior to the Filing Date, the Debtors, either individually or as partners or officers of the entities they owned, borrowed tens of millions of dollars from numerous sources, encumbering their personal assets as well as the assets of the partnerships and corporations. The banks which loaned money to the Debtors included Chemical, Manufacturer's Hanover Trust Company (both now merged with Chase), The Bank of New York, Boston Safe Deposit & Trust Co., Citibank, N.A. and American Savings Bank, F.S.B. In addition, according to the Debtors' schedules, the Debtors borrowed additional sums of money from S.F.S. Management Co., Heller Financial Inc. and one or more individuals.

In November of 1996, the Debtors were indicted on federal criminal charges by the United States Attorney of the District of New Jersey of conspiring to defraud five of these banks, Chemical, Manufacturer's Hanover, Citibank, Bank of New York and Boston Safe out of nearly $38,000,000 from 1987 through 1989. The Debtors

were convicted on April 9, 1998 and are expected to be sentenced in July of 1998.

3. Donna was not actively involved with the management or operation of the businesses and properties at the time the Trustee was appointed nor does it appear that she had been at any time after her mother's death. On a number of occasions she has stated to this court that her brothers excluded her from participating in the management of the various businesses.

4. Because Code § 721 only authorizes a Chapter 7 trustee to operate a debtor's business for a limited time, the court has periodically renewed the Trustee's authorization. Most recently the court signed an order on April 19, 1998 extending the Trustee's authorization to maintain and operate the Debtors' businesses through July 9, 1998.

5. Since 1525 Third Avenue is located on the corner of East 86th Street and Third Avenue, it

largest of the five buildings and currently has four street level retail tenants. The building's residential units are completely vacant.

11. The other four buildings also have ground floor retail space. However, each of these buildings continue to have some occupied apartments.[6]

12. It is apparent that the five buildings comprising the Assemblage are different in size and value.

*The Deeds and the Partnership Agreement*

13. On January 20, 1978 the properties located at 1521, 1523 and 1525 Third Avenue were each conveyed by separate deed from 200 East 86th Street Corporation and Yorkville Realty Corp. to Muriel, Donna and the three Debtors in equal and undivided 20% shares.[7] Each of the deeds specify that the parties hold their interests "*as tenants in common and not as joint tenants.*" (emphasis added).[8]

14. On the same date, these five people executed a partnership agreement (the "Partnership Agreement") creating a partnership to be known as "Yorkville Associates" (collectively, the Debtors, Donna and Muriel shall hereinafter be referred to as the "Partners" and the partnership shall hereinafter be referred to as the "Partnership" or "Yorkville Associates").[9] There is no evidence that the Partnership Agreement was ever recorded.

15. The stated purpose of the Partnership was "to engage in the ownership and management of certain properties known as 1521–1523 Third Avenue, New York, New York, and 200 East 86th Street [1525 Third Avenue], New York, New York, and other buildings which the parties may from time to time agree to purchase." *Partnership Agreement,* ¶ 1.

16. The original capital of the Partnership consisted of each Partner's undivided 20% interest in the three properties. *Partnership Agreement* ¶ 3(a).

17. Under the terms of the Partnership Agreement, the Partners agreed that "*record title* to the lands and premises included in the capital of the partnership * * *, *shall be maintained in the individual partners' names, evidencing each partner's undivided 20% interest therein,* and that no further conveyance to the partnership shall be required, it being agreed that the partnership shall be the equitable owner of said lands and premises." *Partnership Agreement,* ¶ 3(b) (emphasis added).

18. The Partnership Agreement provided that "the death of a partner shall have no effect on the continuation of the partnership business." *Partnership Agreement,* ¶ 13(a). The Partnership Agreement also provided that "upon the death of any partner, the surviving partners shall have the right either to purchase the entire interest of the decedent in the partnership or to terminate the partnership." *Id.* The Partnership Agreement further provided that if the surviving Partners did not elect to purchase the deceased Partner's interest, they "shall proceed with reasonable promptness to liquidate the business of the partnership." *Partnership Agreement,* ¶ 13(c).

---

has a dual address and is sometimes referred to in the parties papers as 200 East 86th Street. For consistency in this decision and ease of discussion, the court will refer to this property as 1525 Third Avenue.

6. 1517 Third Avenue has one rent stabilized and two rent controlled residential tenants remaining. 1519 Third Avenue has one rent stabilized and one rent controlled residential tenant remaining. 1521 Third Avenue has two rent stabilized and two rent controlled residential tenants remaining. 1523 Third Avenue has four rent stabilized residential tenants remaining. Throughout the time the Trustee has been operating the Assemblage under this court's orders, he has consciously sought to reduce the number of

residential tenants in order to enhance the attractiveness of the Assemblage as a development site.

7. The other two properties, 1517 and 1519 Third Avenue, were purchased in 1984 after Muriel's death by the three Debtors and Donna as more fully described in Finding 22.

8. *See* Exhibits 9 and 10 to the *Affidavit of Leonard I. Spielberg In Support of the Trustee's Motion for Partial Summary Judgment* ("Spielberg Affidavit") (Adversary Proceeding Document Number "A.P. Doc. No." 110A).

9. A copy of the Partnership Agreement can be found as Exhibit 7 to the *Spielberg Affidavit.*

19. Following Muriel's death in 1980 the surviving Partners did not purchase their mother's interest in the Partnership nor did they wind up the Partnership or undertake to liquidate its business. This was no doubt because under the terms of Muriel's Last Will and Testament (the "Will"), Muriel conveyed an equal share of her interest in her real and personal assets to each of her four children.[10] Since the Will provided for them to share pro-rata in their mother's interest in Yorkville Associates there was no need for them to buy-out the Estate's interest as they would have effectively been paying themselves.

20. As a result of the failure to follow the precise buy-out procedures set forth in the Partnership Agreement, a great controversy has arisen in this court over the very existence of Yorkville Associates. Donna has asserted that Yorkville Associates continues to exist, albeit in a state of dissolution. The Trustee has at times denied the continued existence of Yorkville. For purposes of the present motion, the Trustee has stated that the court need not adjudicate this issue in order to decide the present motions. Therefore, for purposes of these motions the court deems the Partnership still in existence.

21. Whether or not Muriel's interest in Yorkville Associates has passed to the four children has also been the subject of considerable dispute. The Trustee has stated that the court need not adjudicate this issue ei-ther. Therefore, the dispute does not affect the present motions and the court will assume that the Muriel Sturman Estate retains Muriel's interest in the Partnership and that no distribution of that interest has yet occurred.[11]

22. The Muriel Sturman Estate position has been that it does have a present interest in the Partnership and in the Assemblage since under the terms of the Will, the Executor of Muriel's Estate was granted broad fiduciary powers to retain, sell or manage her interest in any real property as if such Executor was the absolute owner thereof. Only after various claims and administrative expenses of her Estate are paid does any remainder pass to the children.[12]

23. On May 7, 1984, Third Avenue Corporation (a subsequently dissolved corporation in which the three Debtors and Donna were equal shareholders) conveyed 1517 and 1519 Third Avenue to the Debtors and Donna in equal and undivided 25% shares. The two deeds specify that the Debtors and Donna hold their interests "as tenants in common and not as joint tenants."[13] (emphasis added). The Muriel Sturman Estate does not claim an interest in these two properties. While there is no documentary evidence that these two parcels were intended to become incorporated into the Yorkville Associates partnership as permitted by paragraph 1 of the Partnership Agreement, these two parcels appear to have been managed at all

10. A copy of Muriel's Will may be found as Exhibit 6 to the *Spielberg Affidavit.* The Will provided that as to any child under the age of 30, that child's bequest was to be held in trust until the child reached the age of thirty. Only Howard was 30 at the time of Muriel's death. Presently all of the children have attained the age of thirty.

11. This is consistent with how the Executor has acted during the course of these cases.

12. In a letter to the court dated January 21, 1998, the Executor of Muriel's Estate further stated that "from the day the Trustee assumed his position, he dealt with Muriel's Estate in all respects as though there was no question as to its ownership of one-fifth of the Yorkville Partnership * * *. One * * * item should be noted, namely the Trustee submitted to the Court for approval, a Settlement Agreement dated March 6, 1996 between the Trustee, as Seller, South East Partners Corp., as purchaser, and me as Executor of Muriel's Estate. Under this Agreement I was required to provide an executor's deed to three buildings, 1521, 1523, and 1525 Third Avenue, and a Quit Claim deed to the other two buildings and an assignment of all assets of the Muriel Estate including its interest in Yorkville. If the Trustee had determined that Yorkville and the Muriel Estate did not own any part of the 86th Street property, there would have been no point in having an executor's deed signed by me." *See* Exhibit 12 to the *Spielberg Affidavit.*

The Executor also noted that he was a signatory to the Extension Agreement (as hereinafter defined) which consolidated the first mortgage liens on the Assemblage. The Extension Agreement was executed in 1984, four years after Muriel's death.

13. *See* Exhibit 8 to *Spielberg Affidavit.*

times under the Yorkville Associates name and subject to the first mortgage taken out in 1984 which is on all five parcels. Thus it is clear that these two parcels were treated as part of Yorkville Associates.[14]

24. At no time has record legal title in any of the five parcels been in the name of Yorkville Associates.

25. Section 14 of the Partnership Agreement provides that the "partnership will be dissolved and its business wound up upon the occurrence of the earliest of the following events: (a) December 31, 1998; (b) the determination of the parties that the partnership should be dissolved; (c) the insolvency or bankruptcy of the Partnership; (d) the sale or disposition of all or substantially all of the partnership assets; or (e) the death, incompetency, insolvency or bankruptcy of a sole remaining partner."

### The Mortgages on the Assemblage

#### a. The First Mortgage

26. At the time of the Trustee's appointment, there were two mortgages on the Assemblage. The first mortgage which has an original principal amount of $3 million, had been placed on the Assemblage in 1994 with the consent of the three brothers, Donna and the Muriel Sturman Estate. This mortgage was in default both pre- and post-petition.

27. From documents filed with this court, it would appear that the parcels located at 1521, 1523 and 1525 Third Avenue had been owned by the Sturman family for many years prior to the father's death and that there is a long history of liens on these parcels.[15]

28. Ultimately, these liens were consolidated by American Savings Bank, F.S.B. ("AmBank") which made a first mortgage loan of $3 million pursuant to a Consolidation and Extension Agreement dated May 7, 1984 (the "Extension Agreement"). The Debtors, Donna and the Executor of the Muriel Sturman Estate all signed the Extension Agreement. The Federal Deposit Insurance Company ("FDIC") is the receiver of AmBank and as such, succeeded to all of AmBank's rights, title and interest in and to the Extension Agreement and the documents executed in connection therewith.

29. Since the latter two parcels located at 1517 and 1519 Third Avenue were conveyed to the Debtors and Donna on May 7, 1984, the same date as the Extension Agreement was executed, it would appear that the loan from AmBank was used to finance the purchase of these parcels,[16] thereby creating the five parcel contiguous Assemblage. The AmBank mortgage covered all five parcels.

30. On or about July 30, 1992, the FDIC filed proofs of claim asserting a secured claim in each of the Debtors' bankruptcy cases based on the mortgage on the Assemblage in the amount of $3,281,204.61, plus interest.

31. The AmBank mortgage matured by its own terms on June 1, 1994. On the maturity date the loan was in default.

32. In order to compromise and settle the FDIC mortgage, the Trustee entered into a Mortgage Acquisition Agreement dated as of June 1, 1995 whereby the FDIC sold and transferred to the Debtors' estates the AmBank loan and all of the documents executed and delivered in connection therewith, for a

---

**14.** See Finding 15 for text of ¶ 1 of the Partnership Agreement.

**15.** The first mortgage was made on 1525 Third Avenue on November 8, 1952. 200 East 86th Street Corporation was the mortgagor. Other mortgages on that parcel were recorded in 1954, 1955, 1957 and 1960. The 1960 mortgage was made to Greenwich Savings Bank which was consolidated and assigned to United Savings Bank in 1971. In 1971 a first mortgage was also made on the two other parcels by Yorkville Realty Corp. to United Savings Bank. AmBank was successor by merger to United Savings Bank.
 On December 24, 1979 all five Partners took a mortgage from Eastern Property Investors, Ltd.

on the parcels. Eastern subsequently assigned the mortgage to Barclay's American Business Credit, Inc. on February 24, 1983. Finally, on May 3, 1984, the Debtors, Donna and the Executor of the Muriel Sturman Estate took another mortgage from Barclay's which mortgage was consolidated and assigned to AmBank. See Exhibit C to Case Doc. 524, the Trustee's Application for approval of the Settlement Agreement between the FDIC and the Trustee.

**16.** Although the Executor was a signatory to the Extension Agreement, these parcels were only placed in the names of the four living Partners.

total purchase price of $2,275,000.[17] On June 29, 1995 the court approved the Settlement.

### b. The Second Mortgage

33. The second mortgage on the property was executed only by the three brothers and did not encumber the interests of Donna or the Muriel Sturman Estate. The Debtors mortgaged their interests in the proceeds of the Assemblage to S.F.S. Managment Co. in consideration of over $15,000,000. This mortgage was likewise in default at the time of the Trustee's appointment.[18] The Trustee has since entered into a settlement agreement with S.F.S., the second mortgagee.

### The Trustee's Attempts to Sell the Assemblage

34. Almost five years ago and pursuant to an order of this court dated September 19, 1993, the Trustee retained Rockwood Realty Associates, Inc. ("Rockwood") as the Trustee's agent to assist the Trustee in the marketing and sale of the Assemblage.

35. After a valuation, engineering and zoning analysis of the Assemblage, Rockwood conducted a marketing campaign concerning the Assemblage, which included the dissemination of approximately 430 letters introducing the Assemblage to investors and real estate developers and follow up telephone calls to each of the recipients of the introduction letters.

36. Rockwood originally marketed the Assemblage as a whole based on its opinion that the best price would be received for 100% of the Assemblage, as opposed to only the Debtors' interests, because the owners of a partial interest would not be able to develop the Assemblage without the consent and participation of the non-bankrupt co-owners. *Affidavit of John Magee,* President of Rockwood, at 3.[19]

37. Based on its mailing and follow up phone calls, an Offering Memorandum was distributed to approximately 70 parties who expressed preliminary interest in buying the Assemblage as a whole.

38. On or about July 6, 1994, Rockwood met with David Edelstein ("Edelstein") to discuss the acquisition of the Assemblage pursuant to Code § 363(h). Pursuant to a letter of intent dated July 12, 1994, Edelstein and his colleagues offered to purchase the Assemblage for $9,250,000.

39. On or about September 28, 1994, Donna executed an assignment (the "Assignment") in favor of South East Partners Corp. ("South East") of all of her right, title and interest in (i) her claims in the Debtors' bankruptcy cases; (ii) her interest in the Properties; and (iii) her 20% interest in the Muriel Sturman Estate.[20] At the time she made the Assignment she was the 100% owner of South East. Shortly thereafter pursuant to a Stock Purchase Agreement dated as of September 29, 1994, Donna conveyed 51% of her shares of South East to certain individuals, including Edelstein, who later became President of South East.[21] Pursuant to her agreement with South East, Donna was to receive a greater percentage of profits the lower the purchase price South East was able to negotiate for the purchase of the

---

17. *See* Case Document No. 524 for a copy of the Settlement Agreement.

18. Since the second mortgage relates only to the Debtors it will be disregarded in the discussion of the Partnership and the Trustee's efforts to sell the Assemblage. However, the court does note that on December 17, 1991 the Trustee commenced adversary proceedings 91–6659A through 91–6661A against SFS seeking to avoid any lien or encumbrance created by the November 8th mortgage. On December 17, 1993, the Trustee commenced additional adversary proceedings against SFS in the cases of Howard and Wayne, bearing adversary proceeding nos. 93–1038A and 93–1045A. Also on that date, the Trustee commenced adversary proceedings against Moses Marx, a limited partner of SFS, in

the bankruptcy cases of Wayne and Howard bearing adversary proceeding numbers 93–1037A and 93–1040A. On April 14, 1994, the court approved a settlement agreement among the Trustee, SFS and Moses Marx. Each of these adversary proceedings have been dismissed with prejudice.

19. The *Affidavit of John Magee* may be found in support of the Trustee's first *Notice of Motion for Partial Summary Judgment,* dated August 2, 1996 (A.P.Doc. No. 85A).

20. A copy of the Assignment may be found as Exhibit 1 to the *Spielberg Affidavit.*

21. A copy of the Stock Purchase Agreement may be found as Exhibit 4 to the *Spielberg Affidavit.*

interests of the Debtors and the Muriel Sturman Estate in the Assemblage.

40. On or about October 3, 1994, Edelstein advised Rockwood that South East had purchased Donna's interest in the Assemblage. Edelstein further informed Rockwood that while South East was still interested in buying the remaining interests in the Assemblage, it would only do so at a substantially reduced price.

41. Until the Trustee was notified of the Assignment, the Trustee was unaware that during his negotiations with Edelstein to formalize a contract of sale, Edelstein was simultaneously negotiating with Donna for the purchase of her interest in the Assemblage.

42. In light of Edelstein's attempt to renegotiate the purchase price of the Assemblage, Rockwood, at the direction of the Trustee, remarketed the Assemblage. Only three investors, including Harry Macklowe, the principal of Manhattan Westside Stories, L.P. ("Manhattan West"), continued to show interest in the Assemblage, and then only if a substantial break up fee were available due to South East's involvement.

43. In June 1995, the Trustee entered into a contract with Manhattan West for the sale of the Assemblage for $9,000,000. The obligation to close title, however, was expressly contingent upon either of the following occurring on or before June 30, 1996:(a) the non-bankrupt owners of the Assemblage consenting to the sale or (b) the court granting an order permitting the sale of the Assemblage pursuant to Code § 363(h).

44. The non-bankrupt owners of the Assemblage did not consent to the proposed sale to Manhattan West.

45. On August 11, 1995, the Trustee commenced these adversary proceedings on behalf of each of the Debtors for an order, pursuant to Code § 363(h), authorizing him to sell the Assemblage to Manhattan West free and clear of any other interests in the Assemblage.

46. Two of the defendants in these adversary proceedings, Donna and the Muriel Sturman Estate, objected to the proposed sale on the grounds that the sale was not within the scope of Code § 363(h) because the Partners of Yorkville Associates hold their interests as tenants in partnership. Upon receiving these objections the Trustee moved for summary judgment dismissing that defense. The other defendant, South East, objected to the sale on the grounds that the Trustee could not satisfy the requirements of Code § 363(h)(2) and (3).

47. In December 1995, after this court had already denied a request by Manhattan West to extend the June 30, 1996 deadline, Manhattan West contacted the Trustee about purchasing only the Debtors' interests in the Assemblage in order to by-pass the litigation concerning Code § 363(h). Manhattan West offered a purchase price of 60% of the price it had originally agreed to pay for the Assemblage as a whole. Because Manhattan West ultimately wanted to acquire 100% of the interests in the Assemblage, it subsequently withdrew its offer when it found that it was unable to purchase, on acceptable terms, the interests then held in the Assemblage by South East and the Muriel Sturman Estate.

48. Shortly after the Manhattan West deal fell through, South East and the Muriel Sturman Estate contacted the Trustee to propose that the Trustee settle these adversary proceedings by, *inter alia*, selling the Debtors' interests in the Assemblage to South East for the sum of $6,160,000.

49. After six lengthy hearings,[22] and substantial opposition from Donna, who by this was time engaged in a bitter dispute with Edelstein over the Assignment, and from Chase Bank (formerly, prior to two mergers, Manufacturer's Hanover Trust Company and then Chemical Bank), the Debtors' largest unsecured creditor,[23] the court rejected

---

22. These hearings took place on May 21, 1996, May 28, 1996, June 5, 1996, June 7, 1996, June 12, 1996 and August 26, 1996. Transcripts of these hearings are A.P. Doc. Nos. 77A, 78A, 79A, 80A 87A and 92A respectively. After expert testimony during the course of these hearings the court determined that partition of the Assem-

blage would not be practicable. *See* A.P. Doc. 92A, p. 16.

23. Chase Bank, which as Manufacturers Hanover Trust Company, was the sole petitioning creditor in these cases, purports to hold unse-

South East's offer as inadequate. An order rejecting the Settlement Agreement was signed on June 28, 1996.

50. On August 5, 1996, the Trustee renewed his motion for partial summary judgment seeking a declaration from the court that the Partners hold their interests in the Assemblage as tenants in common and that as such the Trustee may sell the Assemblage pursuant to Code § 363(h). Again, Donna, the Muriel Sturman Estate and South East opposed the motion.

51. A hearing was held on September 25, 1996 and this matter was taken under advisement.

52. While awaiting this court's decision, on May 19, 1997, the Trustee entered into a new contract with Charles M. Yassky for the sale of the Properties for a purchase price of $9,250,000 (the "Yassky Agreement"). Like the agreements which came before, the Yassky Agreement was contingent on the Trustee either securing the consent of the co-owners to a Code § 363(h) sale or an order authorizing the sale of the Assemblage together with the court's approval of the Yassky Agreement or any other higher or better offer for the Assemblage. The Yassky Agreement also required court approval of certain aspects of the Yassky Agreement, including a break-up fee, competitive bidding procedures and the scheduling of an auction sale.

53. On June 27, 1997 the Court issued a scheduling order on the Trustee's application for an order approving, *inter alia,* the notice, auction and bidding procedures, break up fee, treatment of Yassky as a good faith purchaser and escrow provisions contained in the Yassky Agreement.

54. The court held a two day hearing on the Trustee's application on July 28 and July 29, 1997 and by order dated August 4, 1997,

the court approved the Trustee's application and authorized the Trustee to conduct an auction sale of the Assemblage.[24] The court also directed the parties to appear after the auction to confirm any sale of the Properties.[25]

55. On November 18, 1997, the Trustee conducted the auction sale. The Trustee received the highest and best cash bid from MAS Limited Liability Co. ("MAS") in the amount of $15 million. A Successful Bid Agreement was entered into between the Trustee and MAS. The MAS offer expires in August of 1998.

56. This sale price is more than sufficient to pay the first mortgage. *See* Finding 32. The remaining Partnership debts, with the exception of real estate taxes of $1 million, are nominal ordinary course of business obligations incurred in the daily management and operation of the Assemblage.

*The Instant Motions*

57. Shortly after the auction sale and on December 22, 1997 the Trustee filed an Amended Complaint naming as defendants South East, Joseph Warren as Executor of the Muriel Sturman Estate, Donna individually and as a general partner of Yorkville Associates, if such partnership still exists and Yorkville Associates, if same still exists.

58. On January 7, 1998 Donna filed an Answer, together with Counterclaims and Cross–Claims against the Trustee.

59. On February 17, 1998 the Trustee filed the present summary judgment motion, once again seeking a declaration that he can use the provisions of Code § 363(h) to sell the Assemblage. The Muriel Sturman Estate no longer objects to the sale.

60. On March 20, 1998, Donna filed a cross-motion for summary judgment seeking a declaration that the Trustee is barred from

---

cured claims in each of the Debtors' cases in the approximate amount of $30,000,000.

**24.** *See* Case Doc. No. 720.

**25.** Donna appealed this order seeking a stay pending appeal and a modification of this order. Specifically, Donna requested that the conditions of the Yassky Agreement be modified to require that prospective purchasers be notified that any

sale of the Assemblage will be stayed pending appeal of any bankruptcy court order authorizing the sale. On November 10, 1997 the District Court denied Donna's requests for both a stay and a modification of the order on the grounds that the order was interlocutory. *See* Order of Judge Koeltl, 97 Civ. 4730(JGK) dated November 10, 1997 (Case Doc. No. 732).

using Code § 363(h) over her objections as a non-debtor co-owner of the Assemblage because the Partners' interests are held as tenants in partnership.

61. After a hearing on April 9, 1998, this matter was taken under advisement.

62. On May 7, 1998, the Trustee filed, by order to show cause, an additional summary judgment motion seeking a declaration that South East, by virtue of Donna's Assignment, was a co-owner of the Assemblage.[26] Donna opposed this motion. After a hearing on May 20, 1998, the court denied the Trustee's motion on the grounds of the then pending litigation between Donna and South East and set a trial date to hear that dispute.

63. In early June of 1998, prior to the scheduled trial date, the court was notified that South East and Donna had settled their dispute and will enter into a stipulation providing that Donna will buy the interests in the Assemblage from South East in consideration of $375,000.

## DISCUSSION

The Trustee seeks a declaratory judgment that he can use the provisions of Code § 363(h) to sell the Assemblage free and clear of the interests of the non-debtor co-owners. The Trustee argues that because the Partners own the Assemblage as tenants in common and because the requirements of Code § 363(h) are satisfied, the court should grant the Trustee the authority to sell the Assemblage free and clear of the co-owners' interests.

Donna asserts that the Partners hold the Assemblage as tenants in partnership with Yorkville Associates as the equitable owner and therefore the Trustee has no authority under any circumstances to sell the interests of the non-debtor co-owners in the Assemblage under Code § 363(h).

The court must note at the outset that none of the original partners of Yorkville Associates have consistently retained a direct interest in the Assemblage. This is because the Trustee has succeeded to the rights of the Debtors and Muriel is deceased and her interest is held in her estate. As for Donna, until June of 1998, Donna and South East had been engaged in a bitter dispute over the validity of Donna's Assignment of her interests in the Assemblage both in state court and here, which dispute was finally resolved in June of 1998, with Donna obtaining the rights to the Partnership interest from South East in consideration of $375,000. Thus, Donna, who was an original Partner, has now only come back into the fold by virtue of buying back her economic interest in the Assemblage from South East. That being said, the court will now address the instant motions.

*Summary Judgment Standards*

The Trustee has moved for partial summary judgment and Donna has made a cross-motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 ("FRCP 56"), as made applicable to adversary proceedings by Bankruptcy Rule 7056, each seeking a declaration as to the nature of the interests held by the Partners and the use of Code § 363(h) to effect a sale. FRCP 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A fact is material only if it affects the result of the proceeding and a fact is in dispute only when the opposing party submits evidence such that a trial would be required to resolve the differences. *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976); *In re CIS,* 214 B.R. 108, 118 (Bankr.S.D.N.Y.1997). The court's function when faced with a motion for summary judgment is to determine whether there exist any genuine issues of material fact to be tried, and not to resolve any factual disputes. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at

26. A.P. Doc. No. 130A.

248–49, 106 S.Ct. 2505; *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996); *Schering Corp. v. Home Insurance Co.,* 712 F.2d 4, 9 (2d Cir.1983).

In ruling on a motion for summary judgment, the court is required to draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment. *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 36 (2d Cir.1994). If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with affidavits, depositions, or other sworn evidence setting forth specific facts showing that there exists a genuine issue of material fact. *Rule v. Brine,* 85 F.3d at 1011; *accord* FRCP 56(e). The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. at 574, 586, 106 S.Ct. 1348 (1986). Instead, the nonmovant must "come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely * * * on the basis of conjecture or surmise." *Trans Sport v. Starter Sportswear,* 964 F.2d 186, 188 (2d Cir.1992) (citation omitted).

The evidence favoring the nonmoving party must be more than merely colorable. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. A mere scintilla of evidence is not enough to create a genuine issue of fact. *See Id.* at 252, 106 S.Ct. 2505. There must be evidence upon which a jury may reasonably rely; and a party may not escape summary judgment on the mere hope that something will turn up at trial. *Id.; Ayers v. Pastime Amusement Company,* 283 F.Supp. 773, 793 (D.S.C.1968); *In re General American Communications Corporation,* 63 B.R. 534 (Bankr.S.D.N.Y. 1986). The court can consider the content of all submitted affidavits in determining whether a proponent's affidavit is sufficient to give rise to a dispute as to material issue of fact. FRCP 56(e); *In re CIS,* 214 B.R. at 118. However, the non-moving party may not simply rely on speculation, conclusory allegations and mere denials to raise genuine issues of material fact. *Nat'l. Westminster Bank v. Ross,* 676 F.Supp. 48, 51 (S.D.N.Y.

1987); *United States v. 15 Black Ledge Drive,* 897 F.2d 97, 102 (2d Cir.1990) (Bare denials are insufficient to create a genuine triable issue of fact).

The parties have cross-moved for summary judgment in their favor. Therefore a brief discussion should be had of the position faced by a court when cross-motions for summary judgment are made. The court must take care to consider each motion separately with respect to analyzing whether any material facts are in issue. One movant's position may depend on a factual finding as to which a material issue of fact exists. There may not be material facts in dispute on the cross-motion. However, the court cannot assume no material facts are in dispute merely because cross-motions for summary judgment have been made.

Only if both sides are proceeding on the same legal theory is it relatively likely that the material facts will not shift as the court shifts between the two motions. When the movants are relying on different arguments, it is much more likely that the court will have to carefully step through the facts to determine that the material facts are not in dispute. The court needs to ensure that the non-moving party on each theory gets the benefit of having the inferences to be drawn from the underlying facts viewed in the light most favorable to it as the party opposing the motion. *Matsushita,* 475 U.S. at 578–88, 106 S.Ct. 1348.

The court must also be mindful that the underlying facts are required to be ones that would be admissible in evidence at trial and shown through an affidavit by one competent to testify. FRCP 56(e). Put another way, the disputed facts must be material as well as admissible at trial before the court need concern itself with drawing inferences favorably to the non-movant. It is perfectly appropriate for the court to make evidentiary rulings on a motion for summary judgment. *See General Electric Co. v. Joiner,* —— U.S. ——, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

The Second Circuit has held that summary judgment is appropriate even when the issue is a contract's proper construction so long as the words of the contract convey a definite

and precise meaning absent any ambiguity. *See Lazard Freres v. Protective Life Insurance Company,* 108 F.3d 1531 (2d Cir.1997); *Seiden Associates, Inc. v. ANC Holdings, Inc.* 959 F.2d 425, 428 (2d Cir.1992). A writing is unambiguous when, construing a as whole and giving each section its plain meaning, the writing is susceptible to only one interpretation. *Dale Carnegie & Associates, Inc. v. Thomas,* 1993 WL 330457, p. *2 (S.D.N.Y.1993). If a writing is clear and unambiguous from its face, its meaning must be determined without resort to extrinsic evidence. *In re Kam Kuo Seafood Corporation,* 76 B.R. 297, 301 (Bankr.S.D.N.Y.1987); *See also Goodheart Clothing Company, Inc. v. Goodman Enterprises, Inc.,* 962 F.2d 268, 272 (2d Cir.1992) (plain meaning should govern the interpretation of the agreement without resort to extrinsic evidence of any nature). It is axiomatic therefore that a contract is to be interpreted so as to give effect to the intent of the parties as expressed in the unequivocal language employed. *In re Hooker Investments, Inc., LJ,* 145 B.R. 138, 143 (Bankr.S.D.N.Y.1992), *citing, Citibank, N.A. v. Plapinger,* 66 N.Y.2d 90, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985) *rearg. denied,* 67 N.Y.2d 647, 499 N.Y.S.2d 1031, 490 N.E.2d 558 (1986).

Moreover, it is well settled in New York that the threshold decision on whether a writing is ambiguous is the exclusive province of the court. *In re Hooker,* 145 B.R. at 143, *citing, Sutton v. East River Savings Bank,* 55 N.Y.2d 550, 554, 450 N.Y.S.2d 460, 462, 435 N.E.2d 1075, 1077 (1982); Patterson, *Interpretation and Construction of Contracts,* 64 Colum.L.Rev. 833, 839 (1964).

In the instant case the key material facts are the five deeds and the Partnership Agreement and no party disputes their existence or content. The parties do disagree about the interpretation of the Partnership Agreement and the characterization of the ownership interests of the Partners. This characterization, however, is an issue of law not fact. The language of a contract is not made ambiguous simply because the parties urge different interpretations. *Seiden Associates,* 959 F.2d at 428. It is undisputed that as of the filing of the petition, title to the Assemblage was recorded in, and presently remains in, the names of the individual Partners and not in the name of the Partnership.

*The Status of Yorkville Associates*

In his motion papers, the Trustee has put forth several interesting and complex arguments regarding the current status and existence of both Yorkville Associates and the ownership interests of the Muriel Sturman Estate. The Trustee asserts that Yorkville Associates dissolved 90 days after the death of Muriel Sturman when the surviving Partners failed to buy out her interest pursuant to the Partnership Agreement. Thus, he contends that Yorkville Associates is no longer in existence. Instead, he argues, the Debtors and Donna became partners in a "new" Yorkville Associates separate and apart from the original Yorkville Associates, which new Yorkville operated as a partnership at will until the bankruptcy of the Debtors at which time, it too dissolved.

Donna has argued that the Trustee is wrong and that Yorkville Associates, in its original configuration, continued after the death of her mother and is still in existence although pursuant to New York Partnership Law § 62, it is in the process of dissolution by virtue of the Debtors bankruptcies. Interestingly, this argument ignores the language of the Partnership Agreement which states that the Partnership will be dissolved and its business wound up upon, *inter alia,* the death or bankruptcy of *a sole remaining partner,* an event which has not occurred. Partnership Agreement ¶ 14(e). Donna further argues that her mother's interest in the Assemblage did not pass to herself and her three brothers by operation of law but rather that Muriel's Estate continued to act as the fifth Yorkville Associates Partner after her death.[27] At worst, Donna argues, Yorkville Associates, in its original form, is in a state of dissolution but it is still legally in existence

---

27. She also argues that the entirety of Muriel's 20% interest should pass to her because of over-distributions made to her brothers. The court notes, however, that the Muriel Sturman Estate only claims a share in the three parcels located at 1521, 1523 and 1525 Third Avenue.

because it has not been formally "wound up" as required by law.[28]

Because the Trustee has unequivocally stated that "[t]his motion does not require the Court to address, no less adjudicate, any of those issues" and that "all that is required is for the Court * * * to determine that the literal conditions of Bankruptcy Code § 363(h) are met,"[29] the court will not address the status of the Partnership or the present interest of the Muriel Sturman Estate. However, it must view the facts most favorable to Donna and therefore for purposes of the Trustee's motion the court will deem that (i) the Yorkville Associates Partnership formed in 1978 is still in existence; (ii) the Muriel Sturman Estate has retained Muriel's 20% interest in the Partnership and remains a co-owner of the Assemblage and (iii) the Debtors' estates have no interest in the Muriel Sturman Estate's 20% share. The court concludes that it can properly determine the characterization of the Partners' ownership interests by way of summary judgment, applying the law to the undisputed facts.

*Code § 363(h) and its Legislative History*

Code § 363(h)[30] deals with the complex problem that arises when fewer than all of the co-owners of property are debtors in bankruptcy. The drafters of the progenitor

of Code § 363(h) hoped that this section would remedy a problem that arose under the Bankruptcy Act of 1898 (the "Act") in cases involving individual debtors who owned undivided interests in property.[31] Under the Act, the trustee in bankruptcy could only sell that portion of the individual debtor's property in which the trustee acquired title. *See,* Former Bankruptcy Act § 70. Since the trustee only acquired title to the debtor's undivided interest in property, that interest was all that could be sold in a partition sale. This restriction often resulted in two sales, each at a depressed value since bidders at each sale were not willing to pay full value for a cotenancy.[32] The drafters of what was to become Code § 363(h) sought to permit the trustee to sell both the debtor's and non-debtor's interest in a single sale under the premise that bidders purchasing the entire interest will pay a higher price that reflects the full market value of the property.[33]

The legislative history of Code § 363(h) supports the conclusion that this section was meant to enhance the trustee's power to collect and reduce to money the property of the estate:

> "* * * [w]ith respect to * * * co-ownership interests, such as tenancies by the entirety, joint tenancies, and tenancies in common, the bill does not invalidate the

**28.** The court notes that New York Partnership Law §§ 60 and 61 states that the dissolution of a partnership does not terminate the partnership and that dissolution must be distinguished from "winding up" the partnership which, by settling the equities among partners, does extinguish the entity. No "winding up" has occurred with respect to Yorkville Associates.

**29.** *Trustee's Memorandum of Law,* dated February 10, 1998, p. 18.

**30.** The relevant provisions of Code § 363(h) provide that:

> "the Trustee may sell both the estate's interest * * * and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if—
> (1) partition in kind of such property among the estate and such co-owners is impracticable;
> (2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free

and clear of the interests of such co-owners; [and]
> (3) the benefit to the estate of a sale of such property free of the interests of the co-owners outweighs the detriment, if any, to such co-owners * * *."

**31.** *See* Countryman, *The Use of State Law in Bankruptcy Cases* (its. 1 & 2), 47 N.Y.U.L.Rev. 437–475 (1972) (discussing the use of state law under the Bankruptcy Act of 1898 and some of the difficulties that resulted from this limitation).

**32.** Bogdanoff, Lee Robert, *Exemptions under the Bankruptcy Code: Using California's New Homestead Law as a Medium for Analysis,* 72 California Law Review 954–955 (September 1984).

**33.** *Id., citing,* Bankruptcy Act Revision: Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary, 94th Cong., 1st & 2d Sess. at 1520–25 (1975–1976) (discussing testimony of Professor Stefan A. Riesenfeld and Attorney Bernard Shapiro as to this desired outcome).

rights, but provides a method by which the estate may realize on the value of the debtor's interest in the property while protecting the other rights. The trustee is permitted to sell it without obtaining the consent or a waiver of rights by the spouse of the debtor or the co-owner, as may be required for a complete sale under applicable State law * * *." (footnotes omitted). H.R.Rep. No. 595, 95th Cong., 1st Sess. at 177, reprinted in 1978 U.S.Code Cong. & Ad. News at 5787, 6137. *See also, In re Brown,* 33 B.R. 219, 221 (Bankr.N.D.Ohio 1983). This reform was implemented and today pursuant to Code § 363(h) a court may authorize a trustee to use his power to dispose of both a debtor's and non-debtor's interests in property.

It is not surprising that historically the section finds its principal use where property, usually the homestead, is owned as tenants by the entirety or as joint tenants between a husband and wife (or between a man and woman who were formerly married), only one of whom is a debtor. Under these circumstances, most courts have understandably been sympathetic to the co-owner's claim and have been reluctant to deprive the non-debtor spouse of a roof over his or her head—even if he or she will receive cash for the interest in the house. *See, Matter of Spain,* 85 B.R. 874, (Bankr.N.D.Ala.1988), *rev'd,* 103 B.R. 286 (N.D.Ala.1988); *Matter of Glass,* 92 B.R. 880 (Bankr.W.D.Mo.1988). In reaching their conclusions, several courts have commented directly on subsection (3) and found that the "detriment" spoken of can be composed in substantial part of the psychological and emotional injury to the person who is forced to give up his or her home. *See In re Persky,* 893 F.2d 15 (2d Cir.1989) ("Congress was acutely concerned with the potential harshness that § 363(h) might create," *citing* 1978 U.S.C.C.A.N. 6137–38); *See also In re Coombs,* 86 B.R. 314 (Bankr. D.Mass.1988); *In re Oswald,* 90 B.R. 218

(Bankr.N.D.W.Va.1988); *In re McCoy,* 92 B.R. 750 (Bankr.N.D.Ohio 1988).

However, in business settings, the courts have been more flexible in approving sales under Code § 363(h). *See In re Calumet Farm, Inc.,* 150 B.R. 664 (Bankr.E.D.Ky. 1992) (if the economic benefit to the Debtor exceeds the economic detriment to the co-owner by even ten cents, the requirements of Code § 363(h)(3) are satisfied); *In re Woolston,* 147 B.R. 279 (Bankr.M.D.Ga.1992) (under Georgia law, partners of a mobile home park failed to overcome presumption that property was separate property of individual partners when property was acquired in individual partners' names, even though the property was the sole business of the partnership); *In re Addario,* 53 B.R. 335 (Bankr. D.Mass.1985) (trustee could sell daughter debtor's interest, as well as her non-debtor father's interest, where sale of fractional interest would be substantially less than would be realized if sale free of co-owners interest and other statutory prerequisites are met); *See also In re Coletta Bros. of North Quincy, Inc.,* 172 B.R. 159 (Bankr.D.Mass.1994) (bankruptcy court set forth the respective burdens of the parties in Code § 363(h)).

Further, under Code § 363 all co-owners affected by the trustee's power to sell property free and clear of their interests are protected or compensated in several manners, including the right to obtain from the net sale proceeds compensation for their interests in the property under subsection (j) [34] and a right of first refusal to purchase the property at the sale price under subsection (i).[35]

The reason courts are more likely to approve a Code § 363(h) sale in a business setting is because the co-owned property is not the homestead, the co-owners are not spouses or former spouses and therefore the psychological and emotional detriment to the

---

**34.** Code § 363(j) provides that "[a]fter a sale of property to which subsection * * * (h) of this section applies, the trustee shall distribute to the * * * co-owners of such property * * * and to the estate, the proceeds of such sale, less the costs and expenses * * * of such sale, according to the interests of such * * * co-owners, and of the estate."

**35.** Code § 363(i) provides that "[b]efore the consummation of a sale of property to which subsection * * * (h) of this section applies, * * * a co-owner of such property * * * may purchase such property at the price at which the sale is to be consummated."

non-debtor co-owner is minimized. The concern with the impact of a family's displacement from its home is thus not at issue in business transactions.[36] Ultimately, however, the authorization granting the trustee the power to sell property pursuant to Code § 363(h) is discretionary, *In re Probasco*, 839 F.2d 1352 (9th Cir.1988), and is an equitable judgment which is necessarily fact driven and therefore considered on a case by case basis.

*Tenancy in Common and Tenancy in Partnership*

■ The central question that needs to be decided is whether the Partners hold their interests in the Assemblage as tenants in common or as tenants in partnership. The difference between the two tenancies is significant because Code § 363(h) only authorizes the sale of interests in property held by tenants in common, joint tenants and tenants by the entirety. While the statute is silent as to tenants in partnership, it has generally been held that since a tenancy in partnership is a well recognized form of tenancy, Congress would have included it among the tenancies expressly covered by the statute if that had been its intention. Thus, the weight of authority is that a sale of an interest held by tenants in partnership is not authorized by Code § 363(h). *In re Normandin*, 106 B.R. 14, 15 (Bankr.D.Mass.1989); *In re Manning*, 37 B.R. 755 (Bankr.D.Colo.1984), remanded on other grounds, 831 F.2d 205 (10th Cir.1987); *In re Victory Pipe Crafts-men, Inc.*, 12 B.R. 822 (Bankr.N.D.Ill.1981). The parties in the instant matter do not dispute that Code § 363(h) may not be used to sell the interests of a tenancy in partnership.

A tenancy in common may be defined as that character of tenancy where two or more persons are entitled to real property in such manner that they have an undivided possession or right to possession in such property but several interests. 24 *New York Jur.* (2d ed.1982), Cotenancy & Partition, § 4. Each tenant in common, regardless of the percentage of his or her interest, has an equal right to possession of the real property in which he or she owns his or her undivided interest. *Id.*, § 14:52: 5A Warren's *Weed New York Real Property* (4th ed.1996), § 301; 24 *New York Jur.* (2d ed.1982), Cotenancy and Partition § 5. There is no right of survivorship among tenants in common and interests held by tenants in common are freely alienable. Therefore, a tenant in common may sell, assign, or devise by will or otherwise, his or her interest in the tenancy in common without the consent of the other tenants in common. *See generally, Clarkson Co. Ltd. v. Shaheen*, 533 F.Supp. 905 (S.D.N.Y.1982).

In contrast, the rights of a tenant in partnership are quite limited. *In re Minton*, 46 B.R. 222, 224 (S.D.N.Y.1985). In a tenancy in partnership, a partner is co-owner with his or her partners of specific partnership property. New York Partnership Law § 51(1).[37]

**36.** As the Supreme Court noted in an analogous situation in *U.S. v. Rodgers*, in allowing the IRS to satisfy a tax assessment against one spouse by selling the couple's home free and clear of the interest of the other spouse, "we are not blind to the fact that in practical terms financial compensation may not always be a completely adequate substitute for a roof over one's head." 461 U.S. 677, 703–04, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983).

**37.** New York Partnership Law § 51 provides:
"1. A partner is co-owner with his partners of specific partnership property holding as a tenant in partnership.
2. The incidents of this tenancy are such that:
(a) A partner, subject to the provisions of this chapter and to any agreement between the partners, has an equal right with his partners to possess specific partnership property for partnership purposes; but he has no right to possess such property for any other purpose without the consent of his partners.
(b) A partner's right in specific partnership property is not assignable except in connection with the assignment of the rights of all the partners in the same property.
(c) A partner's right in specific partnership property is not subject to attachment or execution, except on a claim against the partnership * * *.
(d) On the death of a partner his right in specific partnership property vests in the surviving partner or partners, except where the deceased was the last surviving partner, when his right in such property vests in his legal representative. Such surviving partner or partners, or the legal representative of the last surviving partner, has no right to possess the partnership property for any but a partnership purpose.
(e) A partner's right in specific partnership property is not subject to dower, curtesy, or

In a tenancy in partnership, a partner has an equal right with the other partners to possess specific partnership property for partnership purposes. However, a partner has no right to possess such property for any other purpose without the consent of the other partners. *Id.,* § 51(2)(a); *In re Minton,* 46 B.R. at 224. A partner's right in specific partnership property is also not assignable except in connection with the assignment of the rights of all the partners in the same property. *Id.,* § 51(2)(b). Accordingly, an individual partner has no fractional right in specific partnership property which he alone can assign. *Id.* Moreover, the New York Partnership Law specifically forbids assignment by one partner to a third party unless such assignment is joined by all of the partners. *Id.* A partner's interest in partnership property is therefore not subject to attachment or execution except to satisfy a claim against the partnership. As such, creditors of an individual partner cannot reach the partnership property. *Id.; In re Minton,* 46 B.R. at 224; *Smith v. Smith,* 65 A.D.2d 757, 409 N.Y.S.2d 764, 765 (N.Y.A.D.2d Dept.1978). Further, on the death of a partner his or her right in the partnership property vests, pursuant to statute, in the surviving partner or partners as legal owner and the only right of the deceased partner's estate is to an accounting. New York Partnership Law § 51(d); *In re Sage's Estate,* 31 Misc.2d 715, 221 N.Y.S.2d 414 (N.Y.Sur.1961).[38]

■ Unless otherwise stated, in New York it is presumed that parties hold their interests in real property as tenants in common and the intention to create a tenancy other than a tenancy in common will be given effect only if such intention can be gathered from the instrument creating the ownership

interests and if consistent with the rules of law. *Crawley v. Shelby,* 37 A.D.2d 673, 323 N.Y.S.2d 222 (N.Y.A.D.3d Dept.1971). In the instant case, Donna argues that although record title is in the names of the individual Partners as tenants in common, the Partners nevertheless hold their interests as tenants in partnership. The court disagrees.

■ In the instant case, the granting language in each of the deeds unambiguously and specifically states that the Partners hold their interests "as tenants in common and not as joint tenants." Moreover, the deeds themselves make no reference to the formation of Yorkville Associates or to the contemplation that Yorkville Associates will hold an equitable interest in the Properties. *See* Findings 13 and 23. It is settled New York law that

"a deed, like every other contract 'must be construed according to the intent of the parties, so far as such intent can be gathered from the whole instrument, and is consistent with the rules of law.' Real Property Law, § 240, subd. 3, McK. Conslo.Laws, c. 50. It is only when language used in a conveyance 'is susceptible to more than one interpretation' that courts will look into surrounding circumstances * * *. The settled rule for the construction of such instruments is that all evidence must be excluded which is offered 'to vary, explain, or contradict a written instrument that was complete in itself, and without ambiguity in its terms' since, when words in a deed 'have a definite and precise meaning, it is not permissible to go elsewhere in search of conjecture in order to restrict or extend the meaning.'"

*Loch Sheldrake Associates, Inc. v. Evans,* 306 N.Y. 297, 304–305, 118 N.E.2d 444, 447–

---

allowances to surviving spouses, heirs, or next of kin."

**38.** This survivorship requirement came into effect with New York State's adoption of the Uniform Partnership Act in 1919. Prior to the adoption of this statute, New York common law was that absent contrary intent, lands descended to the heirs at law of a deceased partner subject to payments of partnership debts and adjustments of existing equities between the partners. *Matter of Estate of Havemeyer,* 17 N.Y.2d 216, 217 N.E.2d 26, 270 N.Y.S.2d 197, 200 (N.Y.1966).

With the adoption of the Uniform Partnership Act, the New York legislature enacted express provisions providing that on the death of a partner, property shall pass to the surviving partner or partners as tenants in partnership. *Id.,* 270 N.Y.S.2d at 201, 217 N.E.2d 26. The deceased's estate therefore cannot compel a conveyance of the deceased's real property interest to the estate although it is entitled to an equitable interest in the distribution of any surplus remaining after payment of partnership debts. *In re Lichtblau,* 146 Misc. 278, 261 N.Y.S. 863 (N.Y.Sur.1933).

448 (N.Y.1954), *quoting, Uihlein v. Matthews,* 172 N.Y. 154, 158–61, 64 N.E. 792, 794 (N.Y.1902). The Partnership Agreement reaffirms the characterization of the Partners interests as expressed in the deeds, since it may always be shown that property, title to which is taken in the name of individuals, is in truth and in fact partnership property. *Benham v. Hein,* 50 A.D.2d 808, 809, 376 N.Y.S.2d 581, 582 (N.Y.A.D.2d Dept. 1975).

It is well settled that, as between themselves, the powers, rights, duties and liabilities of the partners are determined by the partnership agreement. *Bogoni v. Friedlander,* 197 A.D.2d 281, 610 N.Y.S.2d 511, 517 (N.Y.A.D. 1st Dept.1994); *see also, Lanier v. Bowdoin,* 282 N.Y. 32, 34, 24 N.E.2d 732, *rearg. denied* 282 N.Y. 611, 25 N.E.2d 391 (N.Y.1940); *In re Dunham's Will,* 52 Misc.2d 364, 365, 276 N.Y.S.2d 132, 135 (N.Y.Sur. 1966).

While "all contracts are made subject to any law prescribing their effect * * *," *In re Havemeyer,* 270 N.Y.S.2d at 199, 217 N.E.2d 26, the New York Partnership Law proscribing a tenancy in partnership can be superseded by the explicit terms of a partnership agreement. *In re Imperial 400 National, Inc.,* 429 F.2d 671 (3rd Cir.1970) ("[T]he partnership agreement is the basic document setting forth the rights and duties of the partners among themselves, and it may alter the provisions of the Partnership Act." 429 F.2d at 678, n. 9); *In Re Estate of Bennett,* 205 N.Y.S.2d 50, 55 (N.Y.Sur.1960) ("[partnership] agreement supersedes the prohibitions of Subdivision 2(b) of § 51 of the Partnership Law and carries out the intention of the parties."); *see also In re Minton,* 46 B.R. at 225, n. 3 (District Court acknowledges parties' ability to alter Partnership Law by partnership agreement).

Although the Partnership Agreement in the instant matter sets forth that the Assemblage is to be held for the benefit of the Partnership, the court finds that the Partnership Agreement, as the agreements in *Imperial 400* and *Bennett, supra,* unambiguously expresses an intent to create a tenancy in common as it clearly modifies the statutorily created incidents of a tenancy in partnership.

This characterization is most notably reflected in Paragraphs 3 and 13 of the Partnership Agreement.

Paragraph 3(b) of the Partnership Agreement states that "[t]he parties agree that *record title to the lands and premises included in the capital of the partnership * * *, shall be maintained in the individual partners names, evidencing each partners undivided 20% fee interest therein,* and that no further conveyance to the partnership shall be required, it being agreed that the partnership shall be the equitable owner of said lands and premises." (Emphasis added). Thus, the Partnership Agreement explicitly sets forth the Partners' intention to hold their undivided interests in the Assemblage as individuals as tenants in common, with legal ownership and record title to the Assemblage remaining vested in the names of the individual Partners and Yorkville Associates being the equitable owner of the Assemblage.

Black's Law Dictionary defines a "fee" interest as an "estate of inheritance clear of any condition or restriction to particular heirs, being descendible to the heirs general * * *. It is the largest and most extensive interest that can be enjoyed in land." Black's Law Dictionary, (6th Ed.1996). By setting forth their interests as undivided *fee* interests, the Partners unequivocally and affirmatively manifested their intention to hold their interests separately and to make their interests freely alienable, characteristics consistent with the attributes of a tenancy in common.

It is also clear that Paragraph 13(a) of the Partnership Agreement modified the statutorily prescribed provisions of New York Partnership Law § 51(2)(d) regarding the survivorship rights of a deceased partner's estate. Paragraph 13(a) explicitly sets forth that "[u]pon the death of any partner, the surviving partners shall have the right either to purchase the entire interest of the decedent in the partnership or to terminate and liquidate the partnership business." By including this "buy out" provision, it is evident that the Partners did not deem the interest of a deceased partner to pass directly to the surviving Partners by virtue of any statutory right

of survivorship under New York Partnership Law. Instead this provision in the Partnership Agreement contemplates a purchase or encumbrance of that interest, which purchase is also consistent with the characteristics of an alienable interest of a tenancy in common.

In support of her argument Donna has cited a number of cases, each of which are distinguishable from the case at bar. *See In re Minton Group*, 46 B.R. 222; *Altman v. Altman*, 271 A.D. 884, 67 N.Y.S.2d 119 (1946), *aff'd* 297 N.Y. 973, 80 N.E.2d 359 (1948); *In re Manning*, 831 F.2d 205 (10th Cir.1987); *In re Palm Gardens Nursing Home*, 46 B.R. 685, 687–9 (Bankr.E.D.N.Y. 1985); *In re Toomey*, 34 B.R. 35 (Bankr. S.D.Fla.1983); *In re Signal Hill–Liberia Avenue, L.P.*, 189 B.R. 648 (Bankr.E.D.Va. 1995); *In re Funneman*, 155 B.R. 197 (Bankr.S.D.Ill.1993); and *In re Olszewski*, 124 B.R. 743 (Bankr.S.D.Ohio 1991).

In *Minton, Manning* and *Funneman*, the court's finding of a tenancy in partnership was predicated, *inter alia*, on the fact that title to the property at issue was recorded in the name of the respective partnerships. Moreover, in *Minton*, the District Court specifically distinguished the case where a partnership held title to property in its own name from a situation in which a partnership agreement set forth that the partners held their interests as tenants in common. 46 B.R. at 225. The *Altman* case did not involve a situation, as in this case, where the partners explicitly agreed to retain legal, record ownership to real property in their own names while transferring beneficial title to a partnership. In *Altman* the partnership agreement provided that real property was to *continue* to be held as a partnership asset. In *Toomey* although the individuals held record title to the property, the partnership itself was the debtor and the property at issue was scheduled as a partnership asset. In *Palm Gardens, Signal Hill* and *Olszewski*, the courts also looked to factors outside the individual partners' record ownership in determining the partnership interest in real property. However, in none of these cases was there a written partnership agreement which was considered by the respective courts. Without such an agreement, these courts necessarily looked to factors involving the conduct of the partners.

If it is evident that a written partnership agreement is a complete expression of the parties' intention, the language of the partnership agreement controls and will not be questioned. *Silverman v. Caplin*, 150 A.D.2d 673, 541 N.Y.S.2d 546, 547 (2nd Dept.) appeal dismissed mem., 74 N.Y.2d 793, 545 N.Y.S.2d 109, 543 N.E.2d 752 (1989). In this case where there is a controlling partnership agreement, there is no need to refer to any other indicia of the Partnership interest in the Assemblage. However, even if the court were to find the Partnership Agreement ambiguous, the material relevant extrinsic evidence, when viewed most favorably to Donna, only bolsters the conclusion that the Partners intended to create a tenancy in common. *U.S. Metalsource Corp. v. W & B Associates, Inc.*, 1997 WL 159595 at *15 (S.D.N.Y.1997), *quoting, Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir.1993) (even if the court determines that a contract is ambiguous, it may nonetheless grant summary judgment if the extrinsic evidence submitted is, as a matter of law, dispositive of the ambiguous provisions).

By explicitly agreeing to hold their interests as tenants in common, the Partners were able to protect themselves against the risk that a rogue partner, acting alone might transfer the Assemblage under the color of apparent authority. This point is underscored by the fact that the Debtors each pledged their *individual* interests in the Assemblage to S.F.S. Management Co., leaving Donna's interest unencumbered by their actions. The inescapable irony of this circumstance is that Donna's unencumbered individual interest may be the only reason the Assemblage was not transferred under color of apparent authority to another entity and the only reason Donna still has an interest to argue about.

Moreover, Donna's own actions are the strongest evidence that the Partners hold their interests as tenants in common. While the court is no longer called upon to decide the validity of Donna's Assignment of her interests to South East or the sale of 49% of the stock of South East, the Assignment and

the Stock Purchase Agreement are clear and unambiguous contracts. In the Assignment Donna purported to assign all of *her* "right, title and interest" in the Assemblage. In the Stock Purchase Agreement, Donna represented, warranted and covenanted that "to the best of [her] knowledge, the only parties having an ownership interest in the [Assemblage] aside from [South East], her assignee, are the Estate of Muriel Sturman, Deceased, the Estate of Wayne A. Sturman, Bankrupt, the Estate of Bruce D. Sturman, Bankrupt, and the Estate of Howard P. Sturman, Bankrupt" and "to the best of [her] knowledge, [South East's] undivided ownership interest in the [Assemblage] is free and clear of any liens" except those set forth in that agreement. The plain construction of both the Assignment and the Stock Purchase Agreement is that Donna believed her interest in Yorkville Associates to be freely alienable and that she executed documents purporting to convey all of her interest in the real estate which she now asserts is held by the Partnership. It must also be noted that at the time Donna conveyed the real estate and her claims in these cases to South East, Donna was the sole officer, director and shareholder of South East.

The court therefore finds that even assuming the facts most favorable to Donna, the explicit and unambiguous language in each of the deeds and in the Partnership Agreement makes it evident that the Partners intended to supersede the applicable provisions of the New York Partnership Law and hold their interests in the Assemblage as tenants in common. Moreover, given the presumption under New York Law that parties hold their interests in real estate as tenants in common as well as the subsequent conduct of the Partners, particularly Donna, the court finds that the Partners hold their interests as tenants in common.

*Yorkville Associates' "Equitable" Ownership of the Properties*

 In Donna's cross-motion, Donna argues that because the Partnership Agree-

ment states that the Partnership "shall be the equitable owner of" the Assemblage, this court does not have jurisdiction to order a sale of the Assemblage, including the interests of the non-debtor co-owners. Donna points to Code § 541(d) which provides:

> "Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."

Code § 541(d) reiterates what is already stated in Code § 541(a): that property of the estate includes bare legal interests held by a debtor as of the commencement of a bankruptcy case.[39] Code § 541(d) then goes on to use a secondary mortgage market example to help describe the circumstances where the statute would apply. Because this language is of limited value in determining the intended scope of the statute, it is necessary to examine the statute's legislative history. According to Senate Report No. 989, regarding the Bankruptcy Reform Act of 1978, Code § 541(e), the forerunner of Code § 541(d), was designed to preserve the manner in which secondary mortgage market transactions were treated under the old Bankruptcy Act. *See* S.Rep. No. 989, 95th Cong., 2d Sess. 83–84 (1978), reprinted in 1978 U.S.Code Cong. & Admin. News 5787, 5869–70. The report states that

> "Section 541(e) confirms the current status under the Bankruptcy Act of bona fide secondary mortgage market transactions as the purchase and sale of assets. Mortgages or interests in mortgages sold in the

---

**39.** Code § 541(a) provides in relevant part that: "[t]he commencement of a case under section 301, 302 or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held: (1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case."

secondary market should not be considered part of the debtor's estate * * *."

Remarks by Senator DiConcini reiterated this by stating

"the purpose of section 541(d) as applied to the secondary mortgage market is identical to the purpose of section 541(e) of the Senate amendment and section 541(d) will accomplish the same result * * *."

124 Cong. Rec. 33,999 (1978). From the legislative history, it is apparent that during the drafting of Code § 541(d), Congress' sole concern was secondary mortgage market transactions. Hence Code § 541(d) is generally limited in application to that area. *See generally, Matter of Plunkett,* 89 B.R. 776, 781–82 (Bankr.E.D.Wis.1988).

However, even if Code § 541(d) has a larger purpose, it is not applicable given the factual circumstances of this proceeding. At best, outside of secondary mortgage market transactions, Code § 541(d) would be applicable only when a debtor's estate holds but bare legal title and *no* beneficial or equitable interest whatsoever in the property at issue. In the instant matter the Debtors not only hold legal title in the Assemblage, they also hold 60% of the interests in the Partnership itself. Given that the Debtors' legal interest is coupled with their majority ownership interests in the Partnership, the court finds that use of Code § 541(d) is not applicable in this proceeding.

The court also finds that the primary case Donna cites in support of her proposition, *In re Palm Gardens Nursing Home,* is not on all fours for reasons not the least of which is that it does not deal with Code § 363(h) or a determination of ownership interests in that context. *Palm Gardens* involved two debtor partnerships which operated nursing homes in Brooklyn, New York. Record title to the properties at issue was held by the partners in their own names. Both nursing homes were the sole occupants of their premises. They had no lease and paid no rent, although they did service the mortgages on their respective properties, which mortgages went into default prior to the filing of the petitions. The mortgagee contended that the mortgaged premises were not properties of the partnerships and that the automatic stay did not apply. The mortgagee premised its arguments on the fact that title to these premises was held in the name of the individual partners and not by the partnership entities. In considering whether the automatic stay protects the debtors equitable as well as legal interests under Code § 541(a), the court looked at several factors to determine the partners' intent. These factors included "their oral statements, accounting, tax records and other records" in the "determination of whether the partnership itself controls, holds, possesses and therefore, equitable (sic) owns the property held in a individual partner's name." *Palm Gardens,* 46 B.R. at 688.

What Donna misapprehends in regard to *Palm Gardens* is the purpose for which the court applied the enumerated criteria to that case. In the absence of a written partnership agreement, the court was left to adduce extrinsic circumstantial evidence to make the determination as to who was the beneficial owner of the properties. In identifying those factors, the court found such criteria to be useful in determining that the properties were in fact intended to be held for the benefit of the partnerships rather than for the benefit of the partners in whose name the properties were titled. Hence, the court resisted a formalistic approach in making its findings.

In the instant case, the intent of the Partners is clearly set forth in the Partnership Agreement. The intent of the Partners was to hold the Assemblage by tenants in common. It is apparent that the equitable ownership retained by the Partnership was merely for the convenience, administration and management of the Assemblage. Through this fiction, the Partnership was able to manage the fee interests of the five Partners in a consolidated fashion rather than having piecemeal accounting, debt service payments, rent collection and the like. This intent is obvious when one views how the Partnership was managed. After the payment of operating expenses and debt service, the remaining revenues were to be divided and distributed on a routine basis among the Partners. Funds were not retained on behalf of the Partnership. Thus,

the true *beneficial* owners of the Assemblage were the individual Partners as tenants in common. Moreover, it is clear that this was the understanding amongst the Partners themselves given that each one pledged or assigned their individual interest in the Assemblage and given that the Partnership Agreement was never recorded and would not put a potential purchaser on notice of Yorkville Associates' "equitable" interest.

*Balance of Equities Favors a Sale under Code § 363(h)*

■ However, were the court to find Yorkville Associates is, in fact, the beneficial owner of the Assemblage the court would still find that the Assemblage could be administered by this court in connection with the Debtors' bankruptcy cases.

The court is more than aware that a sale under Code § 363(h) is an unusual course of action in the best of circumstances. However given the facts, history, complexity and uniqueness of this case, as well as the Trustee's obligation under Code § 704 to "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of the parties in interest" the court believes that such a sale is the only appropriate and available way for the Trustee to administer the bankrupt estates at this point in time.

This matter involves a partnership which if it is not already in dissolution will come to an end on December 31, 1998. *Compare* New York Partnership Law § 62(5). Since the filing of the Debtors' petitions no effort has been made and no action has been commenced by any party in state court to "wind up" this Partnership. *See* New York Part-

nership Law § 61. While judicial intervention is not always necessary to oversee the winding up of partnership affairs, in a case like this, dissolution by decree of a court seems to be required, given the convoluted nature of the ownership of the Partnership interests, the friction among the Partners, the outstanding offer to purchase the Assemblage and the other attendant circumstances which would render such a dissolution equitable. *See* New York Partnership Law §§ 63(1)(f) and (2).

Moreover, New York Partnership Law § 68 states:

"Unless otherwise agreed the partners who have not wrongfully dissolved the partnership or the legal representative of the last surviving partner, not bankrupt, has the right to wind up the partnership affairs; *provided however, that any partner, his legal representative, or his assignee, upon cause shown, may obtain winding up by the court.*" (emphasis added).

Given the fact that each of the original partners pledged, assigned or otherwise encumbered their interests and four of them have a trustee representing their interests, it does not appear that there is a "surviving" partner to wind up the Partnership affairs.

While Donna might argue otherwise, the very fact that she assigned her economic interests to South East leads the court to conclude that she has lost her status as a surviving partner and is merely in the same position as any assignee who purchased the interest from South East. Further, in the nine years since her brothers were put into bankruptcy, Donna has done nothing to advance the dissolution of this Partnership.[40]

---

40. In fact, Donna has not even prosecuted the adversary proceedings she filed in this court against her brothers seven years ago. On October 16, 1990 Donna commenced adversary proceeding no. 90-6520 against Howard Sturman seeking the turnover of certain property upon which a nursing home business was conducted on the grounds that Howard refused to forward to Donna her one-quarter share of the proceeds. No answer has been filed and since the filing of the complaint Donna has not prosecuted this action.

On June 28, 1991 Donna commenced an adversary proceeding in each of the Debtors cases,

adversary proceeding nos. 91-5899A, 91-5900A and 91-5901A, respectively, seeking to remove to this court a civil action pending in the Supreme Court of the State of New York captioned *Butler v. Sturman*, et al., Index No. 15379/87, IAS Part 3. This state court action was commenced in 1987, prior to the commencement of the bankruptcy cases. The thrust of Donna's allegations in the state court action is that the Debtors breached their fiduciary duties owed to her and she sought an accounting with respect to three New York general partnerships in which she was a general partner. No answer has been filed in any of these adversary proceedings and since the

Rather, during the course of these cases she took advantage of the circumstances surrounding the marketing of the Assemblage by undercutting the Trustee and selling her interests to the very entity with whom the Trustee had been negotiating, consequently giving South East leverage to bid on the Assemblage at a substantially reduced price.

When 100% of the interests in the Assemblage were marketed by Rockwood, approximately 70 parties expressed preliminary interest in purchasing them. However, after Donna's Assignment upon marketing the Debtors' 60% interests in the Assemblage, only *two* parties expressed interest, one of which was South East. The other, Manhattan West, ultimately withdrew its offer because of the concern that without the consent and participation of co-owners whose identities and rights were subject to on-going and potentially lengthy, complex and expensive litigation they would not be able to develop the Assemblage. Thus, it is evident that the whole is worth more than the sum of its parts.[41]

Finally, the jurisdiction of the bankruptcy court, like that of any other federal court, is grounded in and limited by statute. Title 28 U.S.C. § 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). The district courts may, in turn, refer "any or all proceedings arising under title 11 or arising in or related to a case under title 11 * * * to the bankruptcy judges for the district." 28 U.S.C. § 157(a).

28 U.S.C. § 157 differentiates between "core" and "non-core" proceedings. Pursuant to 28 U.S.C. § 157(b)(1), a bankruptcy judge "may hear and determine all * * * core proceedings arising under title 11 * * * and may enter appropriate orders and judgments, subject to review [under 28 U.S.C. § 158]." For those purposes, § 157(b)(2) contains a non-exclusive list of "core proceedings." *See* 28 U.S.C. § 157(b)(2). The relevant inquiry in determining whether a proceeding is a core proceeding is "whether the nature of th[e] adversary proceeding, rather than the state or federal basis for the claim, falls within the core of federal bankruptcy power." *In re Manville Forest Products Corp.*, 896 F.2d 1384 (2d Cir.1990); *In re Shea & Gould*, 198 B.R. 861, 866 (Bankr. S.D.N.Y.1996). Generally, in core proceedings, the bankruptcy court conducts the trial or hearing and enters a final judgment.

Non-core proceedings are neither defined nor illustrated in the statute. In non-core proceedings, the bankruptcy court can still hold the trial or hearing, but generally cannot issue a final judgment absent consent of all parties to the proceeding, subject to review by the district court. For purposes of this motion, Donna has stated that to the extent her cross-claims are deemed non-core, she consents to the entry of a final order and judgment by this bankruptcy court.[42]

In the instant case, were the Partnership found to be the beneficial owner of the Properties this proceeding would be a non-core proceeding related to the Debtors' bankruptcy cases. In discussing "related to" jurisdiction, the Supreme Court in *Celotex Corporation v. Edwards* clearly stated that "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate * * * and that the related to language of § 1334(b) must be read to give district courts (and bankruptcy courts under § 157(a)) jurisdiction over more than simple proceedings involving property of the debtor or the estate." *Celotex Corporation v. Edwards*, 514 U.S. 300, 308, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995), *quoting, Pacor, Inc. v. Higgins*, 743 F.2d 984 (3rd Cir. 1984). The Court also noted that "[t]he usual articulation of the test for determining

---

filing of the complaints Donna has not prosecuted any of these actions.

**41.** During the course of oral argument, Donna suggested that partition of the Assemblage is feasible. Given that in the course of this proceeding, the court has previously determined that

partition is not feasible and the law of the case governs this issue, *see* Footnote 22, the court presumes Donna's continued interest in partition is more out of a desire to be a spoiler.

**42.** *See* Donna's *Answer, Counter–Claims and Cross–Claims*, count 90, A.P. Doc. No. 105A.

whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy * * *." *Id.,* 514 U.S. at 308, n. 6, 115 S.Ct. 1493.

In the instant matter there is no question that the disposition of the Assemblage will have an enormous impact on the Debtors estates', given that the Assemblage, whose market value is at least $15 million, is the only significant asset owned by the Debtors remaining to be administered. Moreover, the Debtors not only hold legal title in the Assemblage, they also have an interest as Partners in the Partnership and these interests are clearly property of their estates under Code § 541(a).

While the court is profoundly aware of the difficulty a case like this presents, where the equitable title to property sought to be sold may not be property of the Debtors' estates, the court finds that its subject matter jurisdiction is broad enough to allow it to order a § 363(h) sale of the Assemblage, which is the only available solution in this case to reducing the estates' assets to cash.[43]

The court acknowledges that its ruling will, in essence, cause the liquidation of a non-debtor partnership. However, the court cannot ignore that the Debtors not only hold the majority of the legal title in the Assemblage, 60% of 1521, 1523 and 1525 Third Avenue and 75% of 1517 and 1519 Third Avenue, but they also hold 60% or the majority interests in the Partnership itself.

In the nine year course of this case, Donna never moved the court to lift the stay to proceed with a state court partnership liquidation nor did she file a bankruptcy petition on behalf of the Partnership.[44] Unfortunately, the time has long since past when dealing with this situation as a state court partnership dissolution would be appropriate.

First, a state court liquidation would ultimately result in the sale of the Assemblage under the auspices of the state court. This result would not only double the expense that the Trustee would incur in administering the Debtors interests in connection with the Assemblage, but it would also be *identical* to the result of a sale under Code § 363(h). The protections of Code § 363(h) not only mirror the protections the Partners would receive in a state court liquidation, they may even be enhanced since the non-debtor co-owners can be adequately compensated for the sale of their interests either by exercising their rights to purchase the Assemblage under Code § 363(i) or by obtaining their just percentage of the net sale proceeds under Code § 363(j). Thus, there is no financial detriment to the two co-owners.

Second, such a dissolution would require a state court judge to learn the complex nine year history of this matter. Given the circumstances of this case such a dissolution would likely involve the appointment of a state court fiduciary to manage the Assemblage and oversee the dissolution of the Partnership, much like the Trustee has been doing for the past seven years by order of this court.

Finally, since the Partnership Agreement expires by its terms in December of this year, all that would happen would be that a multi-million dollar asset of the Debtors' estates would sit untouched for another six months while a $15,000,000 purchase bid expires.

Accordingly, it makes no sense to add this matter to the state court docket in order to accomplish a result identical to that presently before this court. Judicial economy therefore dictates that this case would be served best by continuing the supervision of this court and only a Code § 363(h) sale would permit the liquidation of the principal remaining asset of the Debtors' estates and provide a distribution to creditors.

### CONCLUSION

The court grants the Trustee's Motion for Partial Summary Judgment. Donna's

---

**43.** See Code § 105(a) ("This court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.")

**44.** The Trustee could not have commenced a state court liquidation proceeding nor could he file a petition on behalf of the Partnership because he is not a partner of Yorkville Associates.

Cross–Motion for Summary Judgment is denied.